980 A.2d 549

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**John Amos SMALL, Appellee.**

Supreme Court of Pennsylvania.

Submitted June 6, 2006.

Re–Submitted Jan. 5, 2009.

Decided Oct. 5, 2009.

426

428

430

434

Matthew C. Lawry, Philadelphia, for Small, John Amos.

Clarence N. Patterson, Jr., York, Office of the District Attorney, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

Before: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice EAKIN.

A jury convicted John Small of attempted rape and first degree murder for killing Cheryl Smith in 1981. Small was tried jointly with co-defendant James Frey, who was also convicted of first degree murder and attempted rape. The facts underlying Small's conviction follow:

[O]n the evening of August 5, 1981, a group of people, including the victim, attended a party in the Borough of Hanover. Even though many of the attendees at the party were underage, large quantities of alcohol and marijuana were consumed. At some point during the evening, a fight

erupted and the police were called to the scene. Prior to the arrival of the responding police officers, a group of the partygoers left in two separate vehicles and drove to a local tavern. After consuming more alcohol at the tavern, the group drove to a wooded area outside of Hanover, known as "the Pines." Several members of the group departed. At one point, the victim left the remaining members of the group and went into the woods to relieve herself. She was followed by [Small] and co-defendant James Frey. Sometime thereafter, witnesses testified that they heard the victim scream. An eyewitness, Larry Tucker, later testified at trial that he had followed [Small] into the woods and then watched [Small] and the co-defendant grab the victim, throw her to the ground and say to her "you give it to everybody else." [Small] was seen shortly thereafter coming out of the woods with blood on his hands. Co-defendant Frey followed several minutes later and the remaining members of the group then left the Pines leaving the victim in the woods. The victim was never seen alive again and her body was found seven weeks later, in a spread eagle position, naked from the waist down with her shirt rolled around her neck, exposing her upper torso. Forensic evidence indicated that the cause of death was a head trauma.

No arrest was made for a number of years. Finally, police investigators learned that [Small] had been making incriminating statements implicating himself in the murder. Linda Rhinehart testified that she overheard [Small] at an arcade in Hanover state to some friends that: "I followed her into the woods 'cause I was going to get some of that. . . . She won't be a tease anymore. It's amazing what a tire iron can do to hush someone making that much noise." Cerenna Hughes testified that [Small] told her that after the night at the Pines, Cheryl "run away" and "she gave in, she gave up." Harry H. Carper III testified that sometime during 1981, he visited [Small] at his home and [Small] stated "he might have killed" Cheryl Smith and that "he hit her over the top of her head." Lastly, Janice Small, [Small's] wife at the time of the murder, testified that one

night in 1981 when Carper was visiting at their residence, she overheard [Small] say to Carper "I killed a girl.... [We] hit her over the head, dumped her ass in the woods and left her there." She also testified that on one occasion when she was reading a newspaper article about the murder, [Small] walked by and said, "that's the girl we killed." *Commonwealth v. Small*, 559 Pa. 423, 741 A.2d 666, 671–72 (1999) (footnotes omitted). At the penalty phase, the jury found two aggravating circumstances and two mitigating circumstances, and the aggravating circumstances outweighed the mitigating circumstances.[1] The jury imposed a death sentence for the murder conviction. This Court affirmed. *Id.*, at 671. The United States Supreme Court denied certiorari. *Small v. Pennsylvania*, 531 U.S. 829, 121 S.Ct. 80, 148 L.Ed.2d 42 (2000).

Small filed a timely Post Conviction Relief Act (PCRA) petition, which was amended shortly thereafter. The Commonwealth filed a motion to dismiss the petition, which the PCRA court granted on 372 of the 397 paragraphs in Small's petition. The court conducted a hearing concerning the remaining 25 claims, most of which alleged ineffective assistance of counsel. The PCRA court divided the remaining 25 claims into seven groups, addressing each separately. *See* PCRA Court Opinion, 12/16/04, at 7–8. The PCRA court found merit in three claims.

First, Small contended his trial attorneys, Robert O'Brien and Robert Evanick, were ineffective for failing to procure two trial witnesses. In 1995, State Police interviewed Darick Sofi and Robert Elzey regarding a conversation they had with

1. The jury found two aggravating circumstances: the killing was committed in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and Small had a significant history of felony convictions involving the threat or use of violence. *Id.*, § 9711(d)(9). As to mitigating circumstances, Small instructed his attorney not to present any evidence. Nonetheless, the jury, *sua sponte*, found two circumstances they found to be mitigating: no identified convictions since 1982, *id.*, § 9711(e)(8), and Small voluntarily identified burglary locations to police officers, *id.*, § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."). *Small*, at 670–71 n. 4.

Larry Tucker, the Commonwealth's main witness against Small. The interviews revealed Sofi, Elzey, and Tucker were driving in a wooded area in 1991 when Tucker told them they could not remain there long because "this is where I iced this chick." *Id.*, at 11. At trial, Tucker denied making the statement. Small's attorneys failed to produce Sofi or Elzey to rebut Tucker's denial. The PCRA court found trial counsel were ineffective for failing to produce either witness. *Id.*, at 19.

Second, the PCRA court found trial counsel were ineffective for failing to object to Janice Small's testimony under the confidential communications marital privilege. *See* 42 Pa.C.S. § 5914. Janice Small, then Small's wife, testified she was reading the newspaper, and Small walked into the room and said, "That's the girl we killed." PCRA Court Opinion, 12/16/04, at 25. The court noted only Small and Janice Small were in the room, and the confidential privilege applied. *Id.* The court relied on *Commonwealth v. Spetzer*, 572 Pa. 17, 813 A.2d 707 (2002), which held where the marriage is in a severe state of disharmony, the confidential communications privilege is inapplicable. Finding no evidence of marital disharmony, the court found *Spetzer* distinguishable, and found counsel were ineffective for failing to object to the confession on confidential communications grounds. PCRA Court Opinion, 12/16/04, at 26–27.

Lastly, the PCRA court found merit in Small's assertion of ineffectiveness resulting from a conflict of interest arising from Attorney Evanick's prior representation of one of co-defendant Frey's witnesses, Patrick Berlan. *Id.*, at 31, 813 A.2d 707. At Small's trial, Berlan testified regarding a conversation he had with Tucker in 1993 about the Smith murder. Two years prior to trial, the York County Public Defender's Office represented Berlan. Attorney Evanick was York County's chief public defender. When the public defender's office represented Berlan, Berlan never mentioned the Smith murder, although he was trying to help police solve some crimes. Attorney Evanick wanted to use that information to impeach Berlan. However, as he informed the court, he had learned

the information as part of the attorney-client relationship with Berlan. To avoid breaking the privilege, Attorney Evanick agreed with the Commonwealth to work out a stipulation that would inform the jury about that information without breaking the privilege. However, no such stipulation was reached, and Attorney Evanick did not cross-examine Berlan on this matter. *Id.*, at 28–30, 813 A.2d 707.

Relying on *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the PCRA court found the apparent conflict of interest actually affected the adequacy of Attorney Evanick's representation of Small. As such, the PCRA court found prejudice did not have to be demonstrated under *Sullivan*. PCRA Court Opinion, 12/16/04, at 30.

Ultimately, the PCRA court concluded these three claims were meritorious and warranted a new trial, stating, "An inadmissible admission of killing, the non-appearance of witnesses who could undermine the credibility of the prosecutor's chief witness, and a retreat from aggressive cross examination of a witness due to a perceived conflict, in combination, raise a reasonable probability that the outcome of Small's trial would have been different if not for these errors and omissions of counsel." *Id.*, at 33.[2]

**2.** After Small filed his PCRA petition, the PCRA court granted Frey a new trial based on multiple findings of ineffective assistance of counsel. The Superior Court affirmed, and this Court denied the Commonwealth's Petition for Allowance of Appeal. *Commonwealth v. Frey*, 570 Pa. 694, 809 A.2d 902 (2002). Frey then pled guilty to third degree murder. Small filed a motion for summary judgment claiming collateral estoppel mandated similar relief. The PCRA court denied Small relief, finding while the issues in Small's PCRA petition were similar to Frey's, they were not identical. For example, Frey's counsel was ineffective for asserting in his opening statement Frey would testify at trial (Frey did not), mentioning Frey's involvement in an unrelated shooting death and Frey's prior manslaughter conviction, and not calling Sofi and Elzey to impeach Tucker's testimony concerning his statement about the girl that was "iced." *Commonwealth v. Frey*, No. 874 MDA 2001, 799 A.2d 168, unpublished memorandum at 2–11 (Pa.Super. filed March 13, 2002). Only Tucker's statement is at issue in Small's instant PCRA petition. *See infra*, at 441–47, 980 A.2d at 559–62. Finally, Tucker was the only witness identifying Frey as an assailant, *Frey*, at 9, while Small made incriminating statements about his involvement in the Smith murder to four witnesses. *Small*, at 671–72.

The Commonwealth appealed the PCRA court's order granting Small a new trial. We address those issues first. Small cross-appealed the PCRA court's order denying his remaining claims. We address those issues second.

In reviewing an order granting or denying post conviction relief, we examine whether the PCRA court's determination is supported by the evidence and whether it is free of legal error. *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167, 1176 (1999). We are bound by the PCRA court's credibility findings where those determinations are supported by the record. *Commonwealth v. Moore*, 580 Pa. 279, 860 A.2d 88, 99 (2004) (citation omitted).

## I. Commonwealth's Appeal

In review of ineffective assistance of counsel claims, counsel is presumed effective. *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 594 (2007). To overcome this presumption, Small must establish his underlying claims have arguable merit, counsel had no reasonable basis for their action or inaction, and he was prejudiced by counsel's ineffectiveness.[3] *Id.* In order to show prejudice, he must show but for the act or omission in question, the proceeding's outcome would have been different. *Id.*

Although claims of trial counsel's ineffectiveness raised for the first time in a PCRA petition are no longer waived, *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), that holding does not apply here because Small's direct appeal

3. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 976–77 (1987) recognized the *Strickland* test was the proper test to evaluate ineffectiveness claims raised under the Pennsylvania Constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Third Circuit has likewise recognized that Pennsylvania's standard for assessing claims of counsel's ineffectiveness is materially identical to *Strickland*. *Werts v. Vaughn*, 228 F.3d 178, 203–04 (3d Cir.2000). Although the Pennsylvania test for ineffectiveness is the same as *Strickland's* two-part performance and prejudice standard, in application this Court has characterized the test as tripartite, by dividing the performance element into two distinct parts—arguable merit and lack of reasonable basis. *Commonwealth v. Jones*, 571 Pa. 112, 811 A.2d 994, 1002 n. 6 (2002).

concluded prior to *Grant*. *See Washington*, at 594–95. In pre-*Grant* cases, allegations relating to trial counsel's stewardship were waived if not raised by new counsel during post-trial or direct appellate proceedings. *Id.*, at 594 (citing 42 Pa.C.S. § 9544(b); *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 812 (2004)); *see Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003). Therefore, the only cognizable claim before the PCRA court was that of Small's direct appeal counsel's ineffectiveness. *Washington*, at 595 (citing *Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 656 (2003)). "[Small] must therefore present argument as to each layer of ineffectiveness, on all three prongs of the ineffectiveness standard." *Id.* (citing *McGill*, at 1022). Small's PCRA petition alleged all prior counsel were ineffective; we review only his direct appeal counsel's conduct.

## A.

The Commonwealth argues the PCRA court erred in finding trial counsel ineffective for failing to interview and produce Sofi and Elzey at trial. As explained above, Sofi and Elzey would have testified the Commonwealth's main witness, Tucker, told them they could not remain where they were for long because "this is where I iced this chick." PCRA Court Opinion, 12/16/04, at 11. Tucker also speculated he would get away with the murder because he felt police were stupid. *Id.* The Commonwealth argues the "iced this chick" statement's context is not apparent in the record. Specifically, the Commonwealth admits "iced" is slang for killing a person; however, the Commonwealth maintains nothing in the record demonstrates what precise meaning Tucker intended for the term. Moreover, the record also fails to indicate the identity of the person allegedly "iced" or the specific location of the murder to which Tucker may have been referring.

The Commonwealth also contends even if the statement was a confession, its admission would not have altered the trial's outcome. The Commonwealth's theory throughout was multiple assailants murdered Smith. Thus, evidence of Tucker's guilt would not "exonerate nor diminish the culpability of

[Small]." Commonwealth's Brief, at 4. The Commonwealth insists Tucker's guilt would not preclude finding Small guilty under an accomplice liability theory. Therefore, trial counsel cannot be held ineffective for failing to call these witnesses. We agree.

Small argues Tucker was a critical Commonwealth witness, and Sofi and Elzey should have been called to impeach Tucker's credibility. Small argues counsel's minimal efforts to find them were unreasonable. Small contends the jury could have believed Tucker was the killer and he implicated Small and Frey to save himself.

■■ To establish ineffectiveness for failure to call a witness, Small must prove the witness existed and was available to testify for the defense, counsel knew or should have known the witness existed, the witness was willing to cooperate, and the proffered testimony's absence denied him a fair trial. *Washington,* at 599. Small has the burden of showing trial counsel had no reasonable basis for failing to call a particular witness. *Id.*

Small has the burden to prove trial counsel's conduct prejudiced him and thus his direct appeal counsel should have raised this issue on direct appeal. The PCRA court concluded confidence in the trial's outcome was undermined because Sofi and Elzey were not called to testify that while drinking with Tucker ten years after the crime, he uttered the words, "this is where I iced this chick." PCRA Court Opinion, 12/16/04, at 11.

Even assuming the jury believed Tucker's statement to be a confession, and assuming Sofi's and Elzey's testimony would have effectively and fully impeached Tucker's testimony, such impeachment would not have changed the verdict. On direct appeal, this Court concluded "the eyewitness accounts, [Small's] numerous statements admitting to the killing and forensic evidence amply established [Small's] conviction for attempted rape and first degree murder." *Small,* at 672. We did not find this in mere reliance on Tucker's testimony—

"numerous statements admitting to the killing and forensic evidence" are not references to Tucker at all.

In any event, the Commonwealth's theory was never that Small acted alone, but that he acted in concert with others. If the jury believed Sofi and Elzey, and intuited that Tucker's statement meant "I killed Cheryl Smith right here in 1981," the statement would discredit Tucker, but it would not undermine the Commonwealth's theory of the case, nor would it discredit the other evidence previously mentioned. Tucker's credibility had been assaulted to the nth degree already—the jury was shown he was a crook, a recidivist, a drug abuser, a drunkard, and an admitted liar. Given this, Sofi and Elzey were not really "crucial witnesses" who would have made an "immeasurable" difference when piled on top of the mountain of disparagement already there. Even if it were meant as a complete confession to this specific crime, this would not exculpate Small, because none of Sofi's or Elzey's testimony could contradict any of the other evidence against Small.

Therefore, the verdict probably would not have been different. The burden Small carries is not just to prove the jury was likely to reevaluate Tucker if it heard from Sofi and Elzey; he must also prove this would in turn have caused a different verdict. In the face of significant other evidence, including the forensics and the four other witnesses to whom Small made directly incriminating statements, *see Small*, at 671–72, this cumulative rebuttal would not have resulted in a different verdict.

One may always second-guess strategy after a trial is over; indeed, this is done in every murder case brought to this Court. But, however hindsightedly clean the trial might now appear had Sofi and Elzey been called, the legal standard is not cleanliness, much less perfection. Ultimately, we conclude Small did not meet his burden of showing any likelihood the verdict would have been different, and thus he has not established prejudice under our jurisprudence. Therefore, direct

appeal counsel was not ineffective for not raising this issue on direct appeal.[4]

### B.

Concerning marital privilege, the Commonwealth argues the privilege does not apply as Small was charged with murder, his statements were made in the presence of third parties, and Janice Small, his then-wife, waived any applicable privilege that may have applied.

Small argues the communication at issue occurred when Janice and he were alone, and it was confidential. Small argues trial counsel said he was aware Janice's testimony could have been excluded, but provided no reason not to object. Thus, Small contends counsel provided no adequate basis not to object and counsel's failure to object was unreasonable because it allowed in highly damaging testimony.

A spouse may refuse to testify against his or her spouse in a criminal proceeding, but there is no privilege "in any criminal proceeding in which one of the charges pending against the defendant includes murder, involuntary deviate sexual intercourse or rape." 42 Pa.C.S. § 5913. However, § 5914 provides: "in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless this privilege is waived upon the trial." *Id.*, § 5914. These are separate rules, and § 5913's exception preventing a spouse from asserting the privilege in certain criminal proceedings does not trump § 5914. *Commonwealth v. Hancharik*, 534

4. As Mr. Justice Saylor's Concurring Opinion and Madame Justice Todd's Dissenting Opinion observe, the PCRA court frustrated our review by failing to make credibility findings as to the credibility of Sofi or Elzey. However, the other evidence against Small, including his own statements to no less than four individuals admitting his involvement in the murder, render the lack of Sofi and Elzey's impeachment testimony non-prejudicial. Therefore, this claim fails regardless of the credibility of either Sofi or Elzey, and we need not further consider their credibility. Nonetheless, when confronted by claims alleging ineffectiveness by trial counsel for failure to call a witness, we encourage PCRA courts to facilitate appellate review by making credibility findings.

Pa. 435, 633 A.2d 1074, 1076–77 (1993). Thus, the Commonwealth's argument is unpersuasive because it would mean § 5913's exception "applies to both rules, [and] then there is no circumstance where the confidential communications rule of [§ ] 5914 is applicable that the competency provision of [§ ] 5913 is not." *Id.,* at 1077. While § 5913 would prohibit Janice Small from asserting the privilege because Small was charged with murder, we must examine whether § 5914 prohibited Janice Small from testifying to the statement at issue here.

 Section 5914, "which is waivable only by the spouse asserting the privilege, prevents a husband or wife from testifying against their spouse as to any communications which were confidential when made and which were made during the marital relationship." *Commonwealth v. May,* 540 Pa. 237, 656 A.2d 1335, 1341–1342 (1995). Because the privilege could only be waived by Small, the Commonwealth's argument Janice Small waived the privilege is unpersuasive. While Janice Small was divorced from Small when she testified, N.T. Trial, 5/17/96, at 773–74, since the statement at issue occurred when they were married, the privilege could apply. *See Commonwealth v. McBurrows,* 779 A.2d 509, 514 (Pa.Super.2001) ("The privilege remains in effect through death or divorce.").

 For § 5914 to apply, it is also "essential ... the communication be made in confidence and with the intention that it not be divulged." *May,* at 1342; *see also Spetzer,* at 719. We look to whether the spouse making the statement had a reasonable expectation the communications would be held confidential. *May,* at 1342. "Generally, the presence of third parties negates the confidential nature of the communication." *Id.* Even if privileged testimony under § 5914 is erroneously admitted into evidence, it is harmless error if it is merely cumulative of other admissible testimony. *Id.,* at 1343.

 Here, Small's statement, "That's the girl we killed," PCRA Court Opinion, 12/16/04, at 25, does not meet § 5914's requirements. There is no indication of an intent for

the statement not to be divulged, particularly since Small made multiple confessions to many other persons. If Small wanted to keep the statement confidential, he would not have personally divulged it to at least three other people. To conclude the statement at issue was made with the intent it not be divulged, and thus was made in confidence, would essentially render any remark made while two spouses were the only ones present as being made in confidence, thus eviscerating *May's* standard.

Even if the statement at issue is considered confidential, it is clearly cumulative. Janice Small testified Charles Small (Small's brother) and Small returned to the Smalls' home one night in August, 1981, and were "really panicked," *N.T. Trial, 5/17/96, at 784–85.* She testified Small and Charles Small cut their hair, shaved their beards, and Small had blood on his hands. *Id.,* at 774, 778. Janice Small testified Small said "they thought they killed someone," in front of Charles, herself, and Charles' wife, and they all could hear what was said. *Id.,* at 776–77.[5] Janice Small also testified Small said the same thing at Charles Small's home the next day with Charles and herself present. *Id.,* at 782. Janice Small further testified Small told Junior Carper a few days later he killed a girl; specifically, he said, "I killed a girl.... [H]e killed—that they hit her over the head, dumped her ass in the woods and left her there." *Id.,* at 783–84. Janice Small was in the room next to where Small told Carper. *Id.,* at 784. Finally, as we recounted on direct appeal, Linda Rhinehart and Cerenna Hughes also heard Small confess to Smith's murder. *See Small,* at 671–72.

As indicated, Small made multiple similar incriminating statements to multiple persons. Thus, he lacked the requisite

---

**5.** Later in the trial, the Commonwealth conceded Charles Small was in Florida during the Smith murder, and Janice Small's testimony in this regard was about an unrelated incident concerning Hannah Sussman. *See* N.T. Trial, 5/21/96, at 981–98, 1055–56, 1058. However, after trial, the Commonwealth charged Charles Small with perjury and false swearing, believing his alibi was untruthful. Those charges were apparently dismissed on collateral estoppel and statute of limitations grounds. Small's Brief, at 120 n.51.

intent to not divulge the statement for the statement to be confidential under § 5914. Even if the statement to Janice Small had been protected under § 5914, it was harmless error to admit it, as Small's multiple other similar incriminating statements were admitted into evidence. Ultimately, we conclude the PCRA court erred in holding Small received ineffective assistance as a result of trial counsel's not objecting on marital privilege grounds; therefore, direct appeal counsel was not ineffective for failing to raise this issue.

## C.

 Concerning the conflict of interest, the Commonwealth argues the record does not reveal how Attorney Evanick's past representation of Berlan constituted a contemporary or concurrent conflict of interest. The Commonwealth contends the trial court made clear to the jury Berlan's testimony was only to apply to co-defendant Frey, not Small. The Commonwealth contends Berlan's testimony did not implicate Small.

Small argues Attorney Evanick had a conflict of interest preventing him from impeaching Berlan's testimony. Small contends but for the conflict, counsel would have shown Berlan was acting as a police informant when he spoke with Tucker, but he never told police about the conversation until after Small was charged.

 A defendant who failed to object at trial must demonstrate an actual conflict of interest adversely affected his counsel's performance. *Cuyler*, at 348, 100 S.Ct. 1708. *Cuyler* held a defendant who shows counsel's conflict of interest actually affected the adequacy of his representation does not have to show prejudice. *Id.*, at 349–50, 100 S.Ct. 1708. However, we have consistently stated, " 'A defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice.' " *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1231 (2006) (quoting *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1094 (1998) (citing *Commonwealth v. Faulkner*, 528 Pa. 57, 595 A.2d 28, 38 (1991))).

*Spotz* clarified this standard further by stating *Commonwealth v. Hawkins*, 567 Pa. 310, 787 A.2d 292 (2001), reiterated prejudice is presumed when an actual conflict of interest burdens counsel, and this is only if a defendant shows counsel actively represented conflicting interests and the actual conflict adversely affected counsel's performance. *Spotz*, at 1232 (citing *Hawkins*, at 297–98; *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1175 (1986)).

Frey called Berlan to discredit Tucker's testimony. Berlan recounted a conversation he had with Tucker while they were in prison in 1993, in which Tucker did not mention Frey was present at the Smith crime scene. Specifically, Berlan testified that on the night Smith was murdered:

> He [Tucker] stated that it was five people that was with him in the car. When the first car left, that remained [sic] five people with him in his car. He stated that the one girl was sick ..., that's all he gave as far as details of the girl was throwing up in the car and she stayed in the car, while her—himself, Lawrence Tucker, a girl named Cheryl, and the *Small brothers*—....

N.T. Trial, 5/20/96, at 939 (emphasis added). Small's counsel objected after the statement. After a side-bar discussion, the court instructed the jury:

> [W]hat you're hearing from the witnesses that are being called by James Frey only apply to the James Frey case. That is clear.
>
> Now, you've just heard testimony that affected not only James Frey, but also the ... Smalls. You are to disregard that.... I'm instructing you that what this witness said about what Mr. Tucker said about the Smalls is not for you to consider in the case against the Smalls, because we are not in their case, we're in the ... Frey case. And the only thing you are to consider in what Mr. Berlan said is what Mr. Tucker said so far as ... Frey is concerned.

*Id.*, at 948. Shortly thereafter, Attorney Evanick informed the court and opposing counsel of his office's prior representation of Berlan and that Berlan did not inform police of the

information he provided now. *Id.,* at 961–62. While it appeared Attorney Evanick and the Commonwealth reached a stipulation, one was never consummated, and Attorney Evanick never cross-examined Berlan concerning his failure to mention anything about the Smith murder to police.

We conclude the PCRA court erred in finding the failure to cross-examine Berlan about this matter was reversible error. First, as indicated above, Berlan was Frey's witness, and Berlan's purpose in testifying was to recount Tucker's statement that *Frey* was *not* present. The trial court clearly reiterated this in its curative statement, which only "cured" a statement otherwise present in evidence at trial and known to the jury—the Smalls were present at the Smith murder scene. The jury is presumed to have followed the court's instruction. *Spotz,* at 1224.

Second, it is unclear what value Attorney Evanick could have gained for Small from cross-examining Berlan in this regard. Berlan was informally providing police with some information on crimes in the area after Tucker made his 1993 statement. The fact Berlan did not specifically mention Tucker's 1993 statement when informally informing police of crimes does not rise to the level of such a conflict of interest that it prejudiced Small. Tucker's 1993 statement is highly valuable for Frey as it does not place Frey at the murder scene. However, Tucker's statement, and the fact Berlan did not relay it to police earlier, is not as obviously valuable to Small. The only negative for Small from Berlan's trial testimony is he mentioned the Smalls were at the crime scene. But Attorney Evanick quickly objected, and the trial court provided a lengthy curative instruction (which the jury is presumed to follow) of already known information. If Berlan was cross-examined as to why he did not mention Tucker's 1993 statement to police, he might have said he simply forgot, or since he was only informally helping the police, he did not tell them; there could have been any number of different reasons. Ultimately, this uncertainty only allows us to conclude such cross-examination might have helped Small. And even if it would have helped him, we are uncertain to what degree it would

have helped. Consequently, we conclude Small has not shown Attorney Evanick had a conflict of interest creating prejudice to require vacating the guilty verdict and holding a new trial, and direct appeal counsel was not ineffective for failing to raise this claim.[6]

## II. Small's Appeal

The PCRA court dismissed 372 of the 397 paragraphs in Small's PCRA petition, but granted relief on the three issues discussed above. After the Commonwealth appealed, Small filed a 129–page responsive brief, including a cross-appeal raising 18 issues (some with sub-parts). The Prothonotary permitted Small to exceed the 70–page brief limit. *See* Pa. R.A.P. 2135(a)(1) (principal brief shall not exceed 70 pages).

This Court has stated:

[It] is aware of the felt need to leave no stone unturned when counsel presents a capital appeal. However, we note that the quality of representation is not measured by the number of issues raised. It is not necessary to raise patently unavailing matters in order to ward off fears of a later finding of ineffectiveness; a good attorney will not disguise and thus weaken good points by camouflaging them in a flurry of makeweight issues which clearly have no merit.

*Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 510 n. 5 (2004); *see also Commonwealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 479 n. 28 (2004) ("While we certainly understand the duty of the attorney to be a zealous advocate, we pose that conduct such as what we presently encounter does not advance the interests of the parties and, if anything, is a disservice to the client."); PCRA Court Opinion, 6/20/05, at 2–4 (citing *United States v. Hart*, 693 F.2d 286, 287 n. 1 (3d Cir.1982) ("Appellate advocacy is measured by effectiveness, not loquaciousness.")); *Mary Beth Beazley, A Practical Guide to Appellate Advocacy*, 182–83 (2nd ed.2006) (stating views of

6. As a supervisory matter, the better course would have counsel seek to withdraw from the representation upon learning a former client will be testifying against a current client.

multiple appellate judges). Counsel should take these comments to heart; volume on this scale numbs the reader and such quantity bespeaks a lack of quality. A review of Small's issues follows.

## A.

Small first claims the PCRA court erred when it found counsel was not ineffective for failing to impeach Tucker with his *crimen falsi* convictions. Small argues Tucker's credibility would have been eroded to the point where it was reasonably likely Small would have been acquitted. The Commonwealth did not file a brief in response to Small's cross-appeal; thus, there are no Commonwealth arguments to summarize.[7] *See* Commonwealth's Letter, 5/11/06.

Evidence of a witness's conviction for a crime involving dishonesty or a false statement is generally admissible. Pa.R.E. 609(a). A failure to so impeach a key witness is considered ineffectiveness in the absence of a reasonable strategic basis for not impeaching. *Commonwealth v. Baxter*, 537 Pa. 41, 640 A.2d 1271, 1274–75 (1994).

Here, the PCRA court found Tucker could have been impeached for his burglary, unauthorized use of a motor vehicle, and escape convictions. *See* PCRA Court Opinion, 12/16/04, at 9–11. However, both of Small's counsel cross-examined Tucker extensively, "highlighting his numerous prior inconsistent statement and false statements to police. They cross-examined Tucker about his history of drug and alcohol abuse, including on the night in question. Counsel exhaustively impeached Tucker regarding his motive for testifying, and his plea agreement with the Commonwealth." *Id.*, at 10–11. Counsel made sure the jury heard Tucker had been in jail twice between 1988 and 1989, and again in 1995; Tucker admitted lying to police. "Many of the conversations and letters about which he was questioned were from jail." *Id.*, at 11. Thus Tucker's credibility was already assaulted to the nth

7. This Court strongly encourages the Commonwealth to file responsive pleadings, particularly in capital appeals. *See Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1173 n. 1 (2009).

degree—he was depicted as a crook, a recidivist, a drug abuser, a drunkard, and an admitted liar. *See supra,* at 10.

Consequently, we agree with the PCRA court that *"[c]rimen falsi* impeachment would have been merely cumulative and was unnecessary." PCRA Court Opinion, 12/16/04, at 11. Essentially, Small was not prejudiced by counsel not cross-examining Tucker about *crimen falsi* as that information would have just reiterated a significant credibility attack that already occurred; Small's counsel was highly effective in being able to show the jury all the holes in Tucker's credibility. To now conclude such an effective cross-examination was ineffective would defy common sense. Thus, direct appeal counsel was not ineffective for not raising this issue on direct appeal.

## B.

Small argues trial counsel were ineffective for failing to litigate a claim that he was denied due process via prosecutorial conduct. First, Small alleges counsel did not demonstrate the prejudicial effect that coercive police and prosecutorial conduct had on Cerenna Hughes' and James "Smitty's" testimony. Small cites portions of Hughes' testimony showing such conduct occurred. *See* Small's Brief, at 55 (citing N.T. Trial, 5/16/96, at 517–20, 530). However, trial counsel extensively asked Hughes about such alleged conduct during this portion of the testimony. *See* N.T. Trial, 5/16/96, at 517–24. Small also argues police yelled at Smitty, poked Smitty, and threatened Smitty after Smitty said he did not remember what happened the night of the Smith murder. Much of this testimony came before Small's counsel could question Smitty. Even though the jury was aware of this information when Small's counsel questioned Smitty, Small's counsel still referred to, and questioned Smitty about this line of beneficial testimony for Small. N.T. Trial, 5/17/96, at 570–75, 590–91, 593; *see also* N.T. Preliminary Hearing, 7/26/95, at 135–36 (Attorney Evanick elicited testimony on how police helped Smitty remember). Since Small's counsel elicited such beneficial testimony for Small, we do not find trial counsel ineffec-

tive in this regard. Thus, direct appeal counsel was not ineffective for not raising this issue on direct appeal.

Next, Small argues the Commonwealth knowingly presented false evidence from Janice Small since her testimony about the Small brothers' acts the night of the Smith murder was actually proven to pertain to the night of an incident concerning Hannah Sussman that occurred close in time to the Smith murder. Small relies on the general proposition that the knowing presentation of false testimony violates due process. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Small argues his direct appeal counsel was ineffective for not raising this issue. As discussed above, Janice Small testified about the Small brothers' acts after they returned home the night of the Smith murder. *See supra,* at 13. Small contends she was mistaken, and was recalling when the Small brothers returned home after the Sussman incident. The Commonwealth was merely asking Janice Small her recollection of the night of the Smith murder; if the defense successfully showed her recollection was mistaken since she was really recalling the night of the Sussman incident, that was extremely beneficial lawyering for Small, not ineffective assistance. Further, Janice Small potentially mistaking which incident the Small brothers returned home from, when testifying to an event occurring nearly 15 years earlier, is obviously not the solicitation of patently false or perjured testimony. We find direct appeal counsel was not ineffective for not raising this issue on direct appeal.

Next, Small argues the Commonwealth improperly forced Charles Small to present a defense since it knew he had an alibi before trial. Small alleges the Commonwealth should have agreed to Charles Small's dismissal from the trial before Charles Small had to present a defense. The Commonwealth agreed to the dismissal of Charles Small after he presented alibi evidence at trial. N.T. Trial, 5/21/96, at 1055–56, 1058. Small argues the Commonwealth's decision regarding Charles Small prejudiced him, and Small's counsel was ineffective for

not objecting to the continued prosecution of Charles Small. Other than a brief reference to *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), Small provides no legal authority to support this argument. Small has the burden of showing ineffectiveness, *Washington,* at 594; since he only briefly references *Berger,* he has not carried this burden.

Next, Small argues Tucker's plea agreement created an impermissible risk of perjury, and the Commonwealth committed misconduct during closing argument. Small cites no legal authority in this section of his brief; thus, he fails to carry his burden here. *See Washington,* at 594.

Finally, Small argues the PCRA court erred in denying relief. In this subsection, he essentially reiterates the claims discussed above, arguing in total they require he be granted relief and the PCRA court erred. As these claims are discussed individually above, and Small provides nothing further, he is not entitled to relief on this issue.

## C.

 Small argues trial counsel were ineffective concerning testimony of the Sussman incident. Donald Jeffries testified for the Commonwealth, stating he had a conversation with Charles Small about his brother's involvement in a burglary and assault on Sussman. Charles Small's wife also testified about this incident. Small argues counsel were ineffective because this evidence was inadmissible hearsay and counsel did not request a stronger limiting instruction than what the trial court gave. Small refers to two authorities for this issue, a Ninth Circuit case and a decision from this Court asserting a general principle. *See* Small's Brief, at 64 (citing *McKinley v. Rees,* 993 F.2d 1378 (9th Cir.1993); *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835 (1989) (trial counsel ineffective for not requesting limiting instruction on evidence of other crimes)).

The PCRA court acknowledged Small's counsel could have objected to certain testimony as inadmissible hearsay. PCRA

Court Opinion, 12/16/04, at 22. However, the court also concluded counsel could have used this testimony "to bolster the defense theory that Janice Small's testimony about Charles and [Small] returning home to wash, shave, cut their hair, and change clothes was not associated with Cheryl Smith's disappearance but rather occurred on the evening of the Sussman burglary." *Id.,* at 22–23. Small contends the record does not support this strategy as the Commonwealth admitted Charles Small had an alibi for the night of the Sussman crimes. However, Small does not cite to where and when during trial the Commonwealth conceded Charles Small had an alibi for the Sussman crimes. *See* Small's Brief, at 64–65. As indicated above, the Commonwealth agreed to dismiss Charles Small after he presented alibi evidence at trial. N.T. Trial, 5/21/96, at 1055–56, 1058. Thus, when Jeffries testified about the Sussman incident, the Commonwealth had not yet conceded to Charles Small's alibi. It would therefore be reasonable for Small's trial counsel to not object to Jeffries' testimony as Charles Small's alibi was not yet conceded.

The PCRA court also concluded the trial court properly issued a cautionary instruction on prior bad acts. PCRA Court Opinion, 12/16/04, at 23. The trial court first instructed the jury the Commonwealth introduced evidence of the Smalls shaving their hair "to show consciousness of guilt. The defendants argue that that [sic] did not occur at a time frame that could possible [sic] have exhibited consciousness of guilt here, because that happened, according to the defendants' explanation, . . . after the Sussman matter." N.T. Trial, 5/23/96, at 1474. The court told the jury it could consider the evidence as "consciousness of guilt," but it may not regard it as evidence that John Small "is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you find John Small guilty, it must be because you are convinced beyond a reasonable doubt that he committed the crime charged and not because you believe he committed the Sussman offense or that he cut his hair or shaved his beard." *Id.,* at 1474–75.

The court then conducted a side-bar with counsel. Attorney Evanick mentioned the court's prior bad acts instruction was focused on shaving and cutting hair, but it should have been on the burglaries. The court stated it gave an instruction it previously told Attorney Evanick it would give, but it would "correct it, if that's what you [Attorney Evanick] want." *Id.*, at 1504. Attorney Evanick responded, "Fine." *Id.*

The trial court later told the jury, "I was speaking about the cutting of the hair, do you remember, and the shaving of the beard. Disregard that. Erase it from your minds. . . . This evidence, the fact that the burglaries, testimony about the burglaries and the Sussmans, must not be considered by you in any way other than for ... the context of other things, conversation, so on." *Id.*, at 1510. The trial court concluded in this regard, "You must not regard this evidence, the burglaries, as showing that John Small is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you find the defendant guilty, it must be because you are convinced by the evidence that ... John Small ... committed the crimes charged, and not because you believe he is wicked or committed that burglary crime involving the Sussmans." *Id.*

"It is well settled that juries are presumed to follow the instructions of a trial court to disregard inadmissible evidence." *Commonwealth v. Simpson*, 562 Pa. 255, 754 A.2d 1264, 1272 (2000). Small does not argue or point to anything suggesting the jury disregarded the trial court's instruction that it must not consider the Sussman burglary evidence or any belief Small was wicked, but only convict Small for the Smith murder if the evidence proved that. There is no assertion, let alone proof, the jury disregarded this instruction.

Further, we cannot find Attorney Evanick erred for not requesting a different instruction. Quite the contrary, Attorney Evanick informed the trial court of the possible confusion in its original instruction, and was able to get the court to issue a very clear, limiting instruction benefitting Small. We affirm the PCRA court on this issue. Thus, direct

458

appeal counsel was not ineffective for not raising this issue on direct appeal.

## D.

■ Small argues the Commonwealth deprived him of due process by not disclosing exculpatory evidence that Smith's "family had received numerous threats via telephone calls and drive-by actions after her body was found." Small's Brief, at 66. Small concedes he raised an after-discovered evidence claim on direct appeal that this material warranted a new trial. He argues his claim here is not previously litigated because this claim is that the Commonwealth did not disclose the information, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ A PCRA petitioner's allegation of error cannot have been previously litigated. 42 Pa.C.S. § 9543(a)(3). Such an allegation is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2); *see also Commonwealth v. Gwynn,* 596 Pa. 398, 943 A.2d 940, 944 n. 3 (2008). The issue a PCRA petitioner raises under §§ 9543(a)(3) and 9544(a)(2) "refers to the discrete legal ground that was forwarded on direct appeal and would have entitled the defendant to relief." *Gwynn,* at 944. Whether an issue was previously litigated turns on whether "[the issue] constitutes a discrete legal ground or merely an alternative theory in support of the same underlying issue that was raised on direct appeal." *Id.,* at 944–45 (quotation omitted).

Here, since Small is raising the issue of whether the Commonwealth failed to disclose information about the phone calls and drive-bys, it is not a previously litigated claim. The Commonwealth's alleged failure to reveal exculpatory evidence is a discrete legal ground with its own legal standards. *See generally Brady,* at 87, 83 S.Ct. 1194.

■ As Small notes, for his claim to succeed, he must show the Commonwealth possessed the evidence but did not

timely disclose it, and the evidence was favorable and material; thus, there must be a reasonable likelihood the trial's outcome would have been different if it was disclosed. Small's Brief, at 68 (citing *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). We reviewed Small's claim concerning "anonymous threatening phone calls" and "drive-bys" on direct appeal. *Small*, at 673–74. We concluded, "even if this evidence was introduced at trial, [Small] has failed to establish that a different verdict would likely have occurred. Accordingly, the trial court, did not abuse its discretion in denying a new trial." *Id.*, at 674. Since we already concluded the trial's outcome would not likely have changed if information concerning the phone calls and drive-bys was introduced at trial, Small cannot meet *Strickler's* last prong test that there is a reasonable likelihood the trial's outcome would have been different. *Strickler*, at 282, 119 S.Ct. 1936. Thus, direct appeal counsel was not ineffective for not raising this issue on direct appeal, and we affirm the PCRA court on this issue.

### E.

Small argues the trial court improperly excluded evidence concerning Commonwealth witnesses' alcohol and drug use following the Smith murder. On direct appeal, Small argued the trial court erred by prohibiting him from cross-examining Commonwealth witnesses regarding their extensive drug and alcohol use from the Smith murder until his trial about 15 years after the murder, and in preventing his expert from testifying to the long-term effects of substance abuse on one's memory. *Small*, at 677. Small argues this issue is not previously litigated because he is now relying on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), for the proposition state evidentiary rules cannot be mechanically applied to prevent a defendant from presenting a defense, and he claims trial counsel was ineffective for not obtaining a neuropsychologist to be an expert witness. Small's citation to *Chambers* does not change the fact this issue was previously litigated. To hold otherwise would mean

a PCRA petitioner could raise an issue on direct appeal, and raise it again in a PCRA petition merely by citing a different case to support the original theory. However, ineffectiveness is a discrete legal ground from Small's issue on direct appeal, *see Gwynn*, at 945; thus, we must determine if direct appeal counsel was ineffective in this regard.

Counsel cannot be ineffective for failing to raise a meritless claim. *Commonwealth v. Harris*, 578 Pa. 377, 852 A.2d 1168, 1173 (2004). When an appellant has not proven counsel's conduct prejudiced him, his ineffectiveness claim may be dismissed on that basis. *Id.*

A jury should not consider for impeachment purposes the drug or alcohol use of witnesses, except regarding "the time of an occurrence about which [the witness] has testified ..." *Small*, at 677 (citing *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318, 321 (1983); *Commonwealth v. Yost*, 478 Pa. 327, 386 A.2d 956, 961 (1978)); *see also Harris*, at 1174. On direct appeal, we concluded, based on this legal principle, the trial court "did not err in limiting cross-examination about Commonwealth witnesses' drug and alcohol abuse[,]" and thus "there was no relevance to having the expert testify and the trial court properly excluded this portion of his testimony." *Small*, at 677. Since it is clear Small could not have impeached the witnesses concerning their alcohol and drug use after the Smith murder, nor presented related expert testimony, he fails to show he was prejudiced as his direct appeal counsel did not have to raise these meritless claims. We affirm the PCRA court on this issue.

## F.

Small argues trial counsel failed to impeach certain Commonwealth witnesses and to object to improper and prejudicial testimony. Small refers to five instances where counsel were allegedly ineffective. Small cites no legal authority in this section of his brief. *See* Small's Brief, at 73–77. In order to show he was prejudiced by his counsels' conduct, he must

show but for the act or omission in question, his trial's outcome would have been different. *Washington*, at 594.

He first claims counsel should have impeached a Commonwealth witness, Linda Rhinehart, more strenuously. Rhinehart testified "she overheard [Small] at an arcade in Hanover state to some friends that: 'I followed her into the woods' cause I was going to get some of that . . . She won't be a tease anymore. It's amazing what a tire iron can do to hush someone making that much noise.'" *Small*, at 671–72. Small's counsel effectively cross-examined Rhinehart in this regard, learning an older gentleman who served her pizza on the day in question could have heard Small's conversation. N.T. Trial, 5/20/96, at 841–42. Small's trial counsel called Larry Bowers on direct examination. Bowers testified he worked at the pizza counter during the time in question, never heard the conversation to which Rhinehart testified, and had he heard it, he would have reported it to police. N.T. Trial, 5/21/96, at 1127–28. Small contends his trial counsel were ineffective for not confirming Bowers was the man to whom Rhinehart referred, and not asking if he could have heard the conversation from where Bowers was standing. Bowers provided Small with beneficial testimony that he did not hear an incriminating conversation, and if he had, he would have reported it to police. Trial counsel were not ineffective for soliciting such beneficial testimony for Small. Thus, direct appeal counsel was not ineffective for not raising this issue on direct appeal.

Next, Small claims no evidence was produced at trial showing Janice Small had a motive to lie. Small argues trial counsel should have produced documents showing Janice Small filed contempt proceedings related to child support against him. As stated above, Small provides no legal authority in this section of his brief; it is unclear if this evidence would have been admissible at trial. Oddly, he argues his trial counsel should have introduced evidence that child support contempt proceedings were filed against him, yet he also claims counsel was ineffective for not acting to exclude evi-

dence of his involvement in the Sussman burglaries. Essentially, Small argues trial counsel should have tried to admit evidence of his alleged prior bad acts in the contempt proceedings, but tried to exclude evidence of alleged prior bad acts regarding the Sussman incident. We do not find ineffectiveness on the part of direct appeal counsel for not arguing trial counsel were ineffective for failing to introduce evidence of contempt proceedings against Small.

Small next claims trial counsel did not impeach Mary Trish about her lack of truthfulness, to which Nancy Hoffman would have testified. Small's argument in this regard is two short paragraphs.

To establish ineffectiveness for failure to call a witness, a petitioner must prove the witness existed and was available to testify for the defense, counsel knew or should have known the witness existed, the witness was willing to cooperate, and the proffered testimony's absence denied him a fair trial. *Washington*, at 599. It is Small's burden to show trial counsel had no reasonable basis for failing to call a particular witness. *Id.* Small argues several witnesses, including Hoffman, could have testified to Trish's reputation. However, he does not assert how trial counsel knew or should have known of the witnesses, or if the specific witnesses were available at trial. Further, Small concedes trial counsel impeached Trish with prior inconsistent statements and her drug and alcohol abuse when the Smith murder occurred. Because Small fails to show trial counsel knew or should have known of several witnesses and that those witnesses were available to testify, and trial counsel extensively impeached Trish, trial counsel were not ineffective in this regard. Thus, direct appeal counsel was not ineffective for not raising this issue on direct appeal.

Next, Small claims three Commonwealth witnesses provided inadmissible testimony to bolster the Commonwealth's argument that Small and Frey attempted to rape Smith. Small refers to Trish's testimony that although she was intoxicated and passed out, she recalled Small making sexual advances toward her. Michelle Starling testified she heard Small,

Charles Small, and Frey talking about "pussy," and she feared she might be raped or killed. James Hughes testified he thought the men in the woods were raping and hurting Smith.

Again, Small cites no legal authority in this regard, and after referring to this testimony, summarily concludes this evidence was speculative and inadmissible. Since Small offers nothing else, he has not met his burden of showing direct appeal counsel's ineffectiveness.

Finally, within this issue, Small argues trial counsel failed to present admissions by others. Small summarizes these statements, again cites no legal authority, and summarily states trial counsel did not make a strategic decision not to present this evidence. Since Small offers nothing else, he has not met his burden of proving direct appeal counsel's ineffectiveness regarding this issue.

## G.

Small argues trial counsel was ineffective during jury selection. Small first contends the jury pool was contaminated and counsel did not do enough to alleviate this contamination.

Three court employees heard prospective jurors discussing how to get out of jury duty. The trial court then questioned those jurors, and told counsel they could further question them if they wished. Small's counsel did not conduct further questioning of them, which Small claims constitutes ineffectiveness. Small cites no legal authority in this section of his brief, *see* Small's Brief, at 77–78, and does not explain how the trial court's questioning of the jurors was deficient, or if the questioned jurors were ever impaneled. Thus, he fails to demonstrate direct appeal counsel was ineffective for not raising this issue on direct appeal.

Next, Small contends trial counsel were informed some prospective jurors had a discussion about which defendant was most culpable. Again, Small claims counsel should have conducted individual *voir dire* concerning this issue, but he cites no legal authority and does not explain if any juror in this

regard was ever impaneled. Thus, he has not shown direct appeal counsel was ineffective for not raising this issue.

Next, Small contends trial counsel were ineffective for using peremptory challenges to strike three jurors who could have been struck for cause. Small cites *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), which states a "capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is impaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*, at 729, 112 S.Ct. 2222. Here, none of the three jurors were impaneled, as Small's counsel struck them using peremptory challenges. Small cites no legal authority stating counsel can be ineffective for using a peremptory challenge to strike a juror instead of attempting to strike them for cause. The three potential jurors Small objected to being impaneled were not impaneled because his counsel struck them. Small has not shown how this use of peremptory challenges led to a prejudicial jury panel.

Next, Small contends trial counsel were ineffective for not removing the jury foreperson for cause or using a peremptory challenge to strike him. Small relies on the foreperson's statement during jury selection that the death penalty is "need[ed] to be done sometimes to try to keep society on a straight, even keel, I think." N.T. Jury Selection, 5/13/96, at 690. Small argues this statement showed the jury foreperson would be inclined to impose the death penalty to regulate society generally, as opposed to making a judgment based on the aggravating and mitigating factors.

However, a more complete review of the foreperson's jury selection testimony reveals he was a more than suitable juror. Regarding imposing the death penalty, he said, "[It is] a tough decision to make, but based on the evidence I think that decision is sometimes necessary...." *Id.*, at 677. The foreperson agreed the death penalty is appropriate for some homicides, and not for others. *Id.*, at 677–78. He promised to be as fair as possible to the Commonwealth and the defen-

dants, *id.*, at 679, and follow the court's instructions to determine when the death penalty is appropriate and inappropriate. *Id.*, at 686.

The foreperson did not say he would always impose the death penalty; instead, he said it was needed "sometimes." *Id.*, at 677, 690. The foreperson did not indicate he would ignore aggravating and mitigating factors; instead, he promised to be fair and follow the court's instructions. Far from being a juror prejudicial to Small, this is a suitable death penalty juror—willing to impose the death penalty, but only when it is appropriate. Thus, direct appeal counsel was not ineffective for not raising this issue.

█ Finally, Small argues trial counsel were ineffective for not objecting to Juror Graham, who was impaneled. Small contends Graham believed the death penalty was appropriate for any homicide above involuntary manslaughter. Small relies on Graham's statement in response to a question of whether "it's a good idea or not to punish people by death?" N.T. Jury Selection, 5/14/96, at 1042. Graham responded, "I think it's required; if it's necessary, I think it's the right thing." *Id.*

Like the foreperson, a more complete review of Graham's jury selection testimony reveals he was a suitable juror. After counsel informed Graham that murder does not in and of itself make the death penalty appropriate, Graham said, "The murder I was thinking of was just killing someone for no reason, not self-defense, not by accident, okay." *Id.*, at 1043. In response to a question of whether he would be able to impose the death penalty if the Commonwealth met its burden, he said, "If it was required, yes, sir." *Id.*, at 1040. Graham also agreed a murder conviction without considering other circumstances and the trial court's instruction would not be sufficient to impose the death penalty. *Id.*, at 1043. He understood any murder conviction does not automatically lead to the death penalty, and he was committed to following the court's instructions and evaluating other circumstances in determining whether to impose the death penalty. Thus,

direct appeal counsel was not ineffective for not raising this issue.

## H.

Small argues the trial court erred during jury deliberations. The jury asked the court to provide it with Rhinehart's testimony regarding a conversation she had with Scott Fisher about a possible sighting of Smith, certain testimony from Tucker, Cerenna and Smitty Hughes, and copies of letters from Trish and Tucker that were entered into evidence. Small contends the trial court's refusal to provide the jury with the requested information was error.

Small cites one authority in this section of his brief, *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir.1993), asserting it stands for the proposition that "[t]o promise a jury they will be presented with certain evidence, and then fail to deliver on that promise, is highly prejudicial." Small's Brief, at 83 n.36. However, *McAleese* dealt with counsel's promise to produce evidence during trial, not anything to do with the trial court's actions. *McAleese*, at 166 ("The failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel.").

Small raised the same issue on direct appeal:

[Small] next claims that the trial court erred when it denied the jury's request that certain testimony be read back to it during its verdict deliberations. The jury asked to hear the testimony of Linda Rhinehart regarding a conversation she had with "Scott" about a possible sighting of the victim and to hear the testimony from Larry Tucker, Cerenna Hughes, and James Hughes recounting the events of the night of the murder. The jury also asked to see several letters written by Mary Trisch Knight ("Knight") and Larry Tucker that were entered into evidence but which were not part of the material sent out with the jury.

*Small,* at 674. We concluded Small's claim failed. *Id.,* at 675. Since this issue was previously litigated, *see* 42 Pa.C.S. § 9544, we affirm the PCRA court on this issue.

## I.

 Small argues his waiver of his right to present mitigating evidence was invalid. A capital defendant has a right to present mitigating evidence at sentencing, 42 Pa.C.S. § 9711(a)(2), and he can waive that right. *Commonwealth v. Sam,* 535 Pa. 350, 635 A.2d 603, 612 (1993). Counsel has no duty to introduce mitigating evidence where a defendant specifically directed otherwise. *Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 44 (2008) (where capital defendant instructs trial counsel not to offer mitigating evidence, counsel's failure to investigate mitigation evidence not prejudicial).

The trial court issued an order indicating Small was competent to waive his right to present mitigating evidence. Trial Court Order, 7/15/04. The court concluded, "[I]n three separate colloquies, [Small] was thoroughly instructed and advised of the ramifications of waiving said rights. He demonstrated a broad understanding of the consequences of his decision.... [C]ounsel was not ineffective in following [Small's] clear and unambiguous instructions not to present mitigation evidence. [Small's] resolve did not waver." *Id.*

The first colloquy occurred before trial and after the court learned Small wanted to receive the death penalty if he was convicted of first degree murder. N.T. Pre–Trial Conference, 5/1/96, at 2. The trial court thoroughly explained the trial and penalty phase process to Small. *Id.,* at 3–34. Notably, the court stated, "If you don't present any testimony of mitigating circumstances, it is likely that the jury isn't going to find any mitigating circumstances, ... do you understand that?" *Id.,* at 27. Small responded, "Yes, sir." *Id.,* at 28. The court asked Small if he had any questions, and Small said, "No, sir." *Id.* The court asked if Small understood the penalty phase, and Small responded, "Yes, sir." *Id.* Then the court asked if Small's position about receiving the death penalty if he was convicted of first degree murder changed, and Small said, "If I

get found guilty of this crime, I want to be put to death." *Id.*, at 28. Regardless of Small's decision, the court instructed Attorney Evanick to prepare mitigating evidence. Attorney Evanick said, "I would tell the Court right now that that probably will not be done. We have so many other things to do in this case that. . . ." *Id.*, at 29. The court interrupted and reiterated that Attorney Evanick prepare to present mitigating evidence. *Id.*, at 29–30.

The second colloquy occurred after the jury's verdict. Small's counsel informed the court Small desired to receive the death penalty. N.T. Trial, 5/24/96, at 1568–69. The court thoroughly informed Small of the penalty phase process and his rights. *Id.*, at 1569–85. Small said he understood the process throughout the colloquy. *Id.* Notably, Small asked if the colloquy was "what we talked about in your chambers the other week, same thing. I stand by it." *Id.*, at 1571. The court informed Small it was his choice whether to present mitigating evidence. *Id.*, at 1576–77. Small admitted he discussed whether he should present mitigating evidence with his counsel, and he decided not to present such evidence against his counsel's advice. *Id.*, at 1580–82. Small admitted he understood aggravating and mitigating factors, including his right to present mitigating evidence, and he was making his choice from his own free will, and no one threatened him or promised him anything. *Id.*, at 1580–81.

During the third colloquy, which occurred during the penalty phase, the trial court again spoke with Small and his counsel concerning what takes place at a death penalty sentencing phase and whether Small really wanted to waive presenting any mitigating evidence. Notably, Small initially did not want to answer any questions during this colloquy. The court stated, "How can I discharge my duty, then, to be sure that you understand what's going on?" N.T. Sentencing Phase, 5/28/96, at 2. Small responded, "We went through this twice. I understand what's happening." *Id.* The court then completed a thorough colloquy. *Id.*, at 1–5.

The trial court completed three thorough colloquies with Small over a one-month period concerning his decision to not

present mitigation evidence at the penalty phase. The colloquies were so thorough that Small asked during the second colloquy if they were going over the same material discussed in the first colloquy, and Small initially did not want to participate in the third colloquy because he had already gone through two prior colloquies. The trial court was extra-cautious in ensuring Small had three opportunities to understand the process, his rights, and make a knowing, voluntary, and intelligent waiver. Small understood the process through each colloquy, and his decision not to present mitigation never wavered. The trial court did not err.

 Regarding Small's claim his counsel was ineffective, it is clear from the three colloquies that Small consistently directed his counsel to not present mitigating evidence. Small said he discussed death penalty law with his counsel, who answered his questions. N.T. Trial, 5/24/96, at 1580. Small said his counsel advised him to present mitigation evidence and wanted to prepare a penalty phase defense for him, but through his free will he decided not to present mitigation evidence. *Id.*, at 1581–83. Since Small consistently chose to not present mitigating evidence, against his counsel's advice, and was extremely well-informed of the consequences of that decision through the three colloquies, we do not find counsel ineffective for not raising this issue on direct appeal.

J.

Small argues he was constructively denied assistance of counsel in the penalty phase. Small again claims his decision to waive presentation of mitigation evidence was invalid and his counsel abandoned him during the penalty phase by not advocating for him. Since counsel was following Small's consistent and specific instruction not to present mitigation evidence and thus receive the death penalty, direct appeal counsel was not ineffective for not raising this issue on direct appeal. *See supra*, at 574–75.

### K.

Small argues counsel was ineffective for failing to investigate, develop, and present mitigation evidence. Again, counsel was following Small's consistent and specific instruction not to present mitigation evidence; therefore, direct appeal counsel was not ineffective for not raising this issue on direct appeal. *See id.*

### L.

 Small argues the jury improperly found the aggravating circumstance that he committed the murder during the perpetration of a felony. *See* 42 Pa.C.S. § 9711(d)(6). Small contends the jury may have convicted him as an accomplice to the murder, and an accomplice liability conviction cannot support the aggravating factor the murder occurred during the perpetration of a felony.

As Small concedes, this issue was not raised on direct appeal; Small argues direct appeal counsel was ineffective for not raising this issue. Small relies on *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657 (1998), for the proposition accomplice liability is insufficient to meet § 9711(d)(6). *Lassiter*, at 661.

 "[E]ffectiveness of counsel is examined under the standards existing at the time of performance rather than at the point when an ineffectiveness claim is made." *Spotz*, at 1238 (citations omitted). Spotz relied on *Lassiter*, "which we decided nearly three years after the jury sentenced him, on March 6, 1996. Consequently, this Court cannot say that the trial court improperly instructed the jury, nor can it find that trial counsel was ineffective for failing to make a request for the instruction that *Lassiter* would have required." *Id.* (citing *Commonwealth v. Gribble*, 580 Pa. 647, 863 A.2d 455, 464 (2004) ("Counsel cannot be deemed ineffective for failing to predict developments or changes in the law.") (second citation omitted)).

Here, as in *Spotz*, Small's trial and penalty phase occurred in May and June, 1996, *Small*, at 670–71; *Lassiter* was not

decided until two years later; therefore, trial counsel were not ineffective for failing to argue against the (d)(6) aggravator, and direct appeal counsel cannot be ineffective for failing to raise this issue. We also note since Small did not want to present any mitigation evidence and wanted to receive the death penalty, it is further understandable why trial counsel would not have raised this penalty phase issue. Counsel was not ineffective for not raising this issue on direct appeal.

## M.

■■■ Next, Small argues his sentence must be vacated because his burglary convictions were nonviolent crimes that could not establish the aggravating factor of a substantial history of violent convictions. *See* 42 Pa.C.S. § 9711(d)(9). Small contends neither the crime of burglary, nor the specific burglaries he committed, involved violence; thus, the jury could not have used his burglary convictions to satisfy the (d)(9) aggravating factor. Small also argues the jury instructions established a presumption his burglary convictions were crimes of violence.

Burglary is defined as "[entering] a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter." 18 Pa.C.S. § 3502(a). Small contends Pennsylvania law is inconsistent concerning whether burglary is a crime of violence. Small's Brief, at 116.

In *Commonwealth v. Christy*, 511 Pa. 490, 515 A.2d 832 (1986), this Court suggested that in order for a burglary to be classified as a violent crime, the Commonwealth may have to present evidence the defendant actually threatened another with violence or used violence. *Id.*, at 841. Two years later, however, we clarified our view of burglary in *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988), where we explained the portion of *Christy* discussing burglary was merely dicta, and in Pennsylvania "the crime of burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person." *Id.*, at 559, n. 5. "Every

robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance," and it is this non-privileged entry that poses a threat of violence to persons. *Id.*, at 559. This was the law as it stood at the time of Small's conviction and sentencing. *See e.g. Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 769–70 (1998); *Commonwealth v. Bracey,* 541 Pa. 322, 662 A.2d 1062, 1075 n. 15 (1995). As our cases have not produced an inconsistent, arbitrary, and capricious definition of burglary, it was not a violation of Small's rights to use a burglary conviction to establish the § 9711(d)(9) aggravator. Consequently, direct appeal counsel was not ineffective for not raising this issue.

■ The trial court's instructions did not create a conclusive presumption that Small's burglaries would meet the aggravating factor of a substantial history of violent felony convictions. The court properly instructed the jury that "the following matters if proven to your satisfaction beyond a reasonable doubt can be aggravating circumstances...." N.T. Sentencing, 5/28/96, at 102. The court reiterated the beyond a reasonable doubt standard for the aggravating factor of a "significant history of felony convictions involving the use or threat of violence to the person...." *Id.*, at 103. The court stated it was referring to Small's burglary convictions from the 1970s and 1980s. *Id.* The court accurately described burglary as a crime of violence, and stated such a crime "may be related [sic] upon during the penalty phase of capital murder prosecution to prove a history of violent convictions." *Id.* The court twice told the jury to determine if Small had a significant history of felony convictions, it should consider the number of prior convictions, their nature, and their similarity to or relationship with the Smith murder. *Id.*, at 105. The court concluded in this regard by stating, "So that is going to be up to you to decide whether the Commonwealth has established in your mind beyond a reasonable doubt that he does have the—John Small has a significant history of felony convictions involving the use or threat of violence to the person." *Id.*

The court consistently informed the jury it was to decide if the Commonwealth established beyond a reasonable doubt his burglary convictions showed a significant history of violent felony convictions. The court also accurately stated burglary is a crime of violence; thus, the court properly instructed the jury of the appropriate legal standards and allowed it to decide if the Commonwealth proved the (d)(9) aggravator. Accordingly, direct appeal counsel was not ineffective for not raising this issue on direct appeal, and we affirm the PCRA court on this issue.

## N.

Small argues he is entitled to a new trial because Tucker recently made an exculpatory statement concerning Small's role in the Smith murder. Small contends Elzey testified at Frey's PCRA hearing that in 2000 Tucker told him, "We'll let bygones be bygones, because I got off from it anyway, and the other guys got shafted." Small's Brief, at 118 (citation omitted). Small argues Tucker admitted his guilt in this statement, which would have resulted in a different verdict for Small if introduced at trial.

First, this statement appears to be hearsay, as Elzey is testifying to what Tucker told him, and Small wants to present it to prove the truth of the matter asserted. *See* Pa.R.E. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Small does not argue any hearsay exception applies to allow the admission of Tucker's statement. Small's claim fails in this regard.

Second, even if admissible, the statement would not warrant granting Small a new trial. The part of the statement where Tucker supposedly admits his guilt is not damaging to the Commonwealth's case. As explained above, the Commonwealth argued Small did not act alone, but in concert with others. *See supra,* at 443–44, 980 A.2d at 560. A confession from Tucker would not undermine the Commonwealth's theo-

474

ry of the case, nor would it discredit the other evidence previously mentioned. As we indicated above, "On direct appeal, this Court concluded 'the eyewitness accounts, [Small's] numerous statements admitting to the killing and forensic evidence amply established [Small's] conviction for attempted rape and first degree murder.'" *Id.*, at 443, 980 A.2d at 560 (quoting *Small*, at 672). Since there was ample evidence from a wide range of sources to support Small's conviction, Tucker's alleged statement does not undermine one's confidence in the verdict. Therefore, direct appeal counsel was not ineffective for not raising this issue, and we affirm the PCRA court.

## O.

■ Small argues he is entitled to a new sentencing hearing since at his sentencing he did not know Frey would be convicted of third degree murder, and Charles Small would not be subject to any criminal liability. Other than citing the general PCRA standard that if this information was available to the jury, the sentencing outcome would have been different, Small's Brief, at 120 (citing 42 Pa.C.S. § 9543(a)(2)(vi); *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806 (2004)), Small cites no other authority in this section of his brief. Small thus baldly asserts and speculates if the jury knew the information about Frey and Charles Small, they would not have imposed the death penalty. Even if Small had a penalty hearing with his co-defendants, he would not necessarily be entitled to relief. *See Commonwealth v. Romero*, 595 Pa. 275, 938 A.2d 362, 381 (2007) ("no requirement that co-defendants receive separate penalty hearings once both are found guilty."). As Small offers us nothing else on this issue, direct appeal counsel cannot be found ineffective, and we affirm the PCRA court on this issue.

## P.

■ Small argues the Commonwealth's reliance on contradictory theories of whether Charles Small was involved in the murder violated his due process rights. The Commonwealth charged Charles Small in relation to the Smith murder. Be-

fore the case was submitted to the jury, the Commonwealth conceded Charles Small's alibi that he was in Florida when the murder occurred was supported by documentary evidence. After trial, the Commonwealth charged Charles Small with perjury and false swearing, believing his alibi was untruthful. Those charges were apparently dismissed on collateral estoppel and statute of limitations grounds. *See* Small's Brief, at 120 n.51. The Commonwealth believed Charles Small was involved in the Smith murder; when the evidence at trial verified his alibi, the Commonwealth conceded as such. After trial, when the Commonwealth thought Charles Small lied concerning his alibi, it sought to prosecute him for that. The Commonwealth merely attempted to follow the evidence and act accordingly. Finally, Small does not show how the Commonwealth's conduct before, during, and after trial concerning Charles Small so undermined his trial and sentencing that those proceedings' outcomes would have been different. Accordingly, direct appeal counsel was not ineffective, and we affirm the PCRA court on this issue.

## Q.

Small argues he is entitled to a new trial and sentencing because of the prejudicial effect of the cumulative errors in the case. Small broadly and vaguely asserts "counsel's serious failures, and the constitutional errors committed by the court and the prosecutor, so undermined the ... trial and sentencing ... that [Small's] conviction must be overturned, or, ... his sentence of death must be vacated." *Id.*, at 126. As discussed above, we do not find any errors warranting a new trial or new sentencing; thus, Small's cumulative effect argument fails. *See Commonwealth v. Williams,* 532 Pa. 265, 615 A.2d 716, 722 (1992) ("We have found *no* misconduct on the part of the prosecutor, and no number of *failed* claims may collectively attain merit if they could not do so individually."). Further, his argument in this regard is too broad and vague to warrant granting a new trial or new sentencing. We affirm the PCRA court on this issue.

R.

Finally, Small argues the PCRA court erred in denying his requests for discovery and abatement of the proceedings and in limiting the evidentiary hearing. Small contends he was entitled to many items through discovery; he focuses on information concerning the Commonwealth's prosecution of Charles Small. Small cites no legal authority concerning his discovery/abatement claim; thus, that argument fails.

Next, Small argues the PCRA court inappropriately limited the extent of his PCRA hearing. He cites cases concerning whether, and when, a PCRA petitioner is entitled to a hearing. *See* Small's Brief, at 128 (collecting cases). However, he provides no authority concerning his argument the PCRA court inappropriately limited its hearing. As Small offers nothing else on this issue, we affirm the PCRA court.

### III. Conclusion

We reverse the PCRA court's decision granting Small a new trial, and affirm the remaining portions of the PCRA court's decision denying Small relief. We direct the Prothonotary of this Court to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

Jurisdiction relinquished.

Justice BAER and McCAFFERY and Justice GREENSPAN join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice TODD files a dissenting opinion.

Chief Justice CASTILLE, Concurring.

I join the Majority Opinion, writing separately only to elaborate on three minor points. First, a decision in this case was made unnecessarily difficult by the York County District Attorney's unexplained failure to brief appellee/cross-appellant Small's 20–issue cross-appeal. I agree with the Majority's

notation that the Commonwealth is strongly encouraged to file responsive pleadings in capital cases. Such a failure is particularly perplexing where, as here, the Commonwealth was the initial appellant and appellee cross-appealed. Going forward, I am not convinced that we should simply accept the Commonwealth's determination not to participate in capital cases. To facilitate this Court's disposition of these difficult and laborious cases, perhaps we should first issue a rule to show cause upon the Commonwealth why a capital defendant's request for relief should not be summarily granted, if the Commonwealth indicates no interest in defending a death penalty judgment.

Second, respecting the Commonwealth's argument on Small's conflict of interest claim, I note that, pursuant to U.S. Supreme Court decisional law, a defendant alleging a conflict of interest in a successive representation case may be required to establish *Strickland*[1] prejudice, rather than merely demonstrate that, at the time of his trial, his counsel actively represented conflicting interests and that such conflict adversely affected counsel's performance. *See Mickens v. Taylor*, 535 U.S. 162, 174–76, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).[2] In the present case the Majority seems to apply this standard in reversing the PCRA court's grant of a new trial on Small's conflict of interest claim. *See* Majority Op. at 451, 980 A.2d at 565–66 ("we conclude Small has not shown Attorney Evanick had a conflict of interest creating prejudice to require vacating the guilty verdict"). I join in that approach. Although *Strickland* prejudice was not shown in the case *sub judice*, I agree with the Majority that, as a supervisory

1. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

2. While *Mickens* explicitly left unresolved the "open question" of whether *Strickland* prejudice must be shown "in cases of successive representation," *Mickens*, 535 U.S. at 176, 122 S.Ct. 1237, several federal Circuit Courts have noted that *Mickens* suggests that *Strickland* prejudice must be shown. *See, e.g., Alberni v. McDaniel*, 458 F.3d 860, 873–74 (9th Cir.2006), *cert. denied*, 549 U.S. 1287, 127 S.Ct. 1834, 167 L.Ed.2d 333 (2007); *Moss v. United States*, 323 F.3d 445, 461 (6th Cir.2003); *Holleman v. Cotton*, 301 F.3d 737, 743 (7th Cir.2002); *see also Lordi v. Ishee*, 384 F.3d 189, 193 (6th Cir.2004) (holding that *Strickland* "is the controlling authority for an ineffectiveness claim based on a conflict of interest for a successive representation").

matter, in future cases counsel would be wise to seek to withdraw from the representation upon learning that a former client will be testifying against a current client.

Finally, I would add the following observation respecting Small's claim that burglary is not a crime of violence for purposes of the Section 9711(d)(9) aggravator.[3] As the Majority notes, this Court has previously recognized that, in Pennsylvania, burglary was always viewed as a crime of violence, and we have consistently construed it as such for purposes of Section 9711(d)(9). *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553, 559 (1988) ("[T]he crime of burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person."); *see also Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307, 321 (2008) ("[B]urglary is always classified as a violent crime in Pennsylvania") (internal quotation marks omitted); *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 814 (2007) (same). I would note, however, that the General Assembly is, of course, free to define the crime differently for other purposes, and it did so (after *Rolan* was decided) in the two-strikes/three-strikes scenario. *See* 42 Pa.C.S. § 9714(g) (burglary only deemed "crime of violence" for purposes of two and three strikes mandatory punishment when burglary is "of a structure adapted for overnight accommodation in which at the time of the offense any person is present."). Thus, it is no longer accurate to say, as *Rios* and *Pruitt* did, that burglary is always classified as a crime of violence in Pennsylvania, even though it certainly remains a violent crime for purposes of the Section 9711(d)(9) aggravator.

Justice SAYLOR, Concurring.

The majority's rationale in overturning the PCRA court's award of a new trial is grounded largely on a finding of insufficient prejudice to support it. *See* Majority Opinion, at 442–44, 448–51, 980 A.2d at 559–60, 563–64. Although I join

---

3. 42 Pa.C.S. § 9711(d)(9) (defendant has significant history of felony convictions involving use or threat of violence).

the majority's ultimate holding, my approach is substantially different as concerns the details of the prejudice evaluation.

This case was obviously a difficult one for the Commonwealth to investigate and prosecute. None of the immediate fact witnesses was forthcoming with police-most lied repeatedly to the investigating officers. *See, e.g.,* N.T., May 23, 1996, at 1425 (reflecting the district attorney's remark to the jury, "make no mistake here, I told you up front when I talked to you about what our case was going to be, all these people lied initially to the police").[1] The Commonwealth admitted a serious misidentification by several of its witnesses, since those individuals had testified Appellant's brother, Charles Small, was at the scene of the killing, but the district attorney conceded late in the trial that Charles Small was not present. *See* N.T., May 23, 1996, at 1424 (reflecting the prosecutor's remark: "Now Charles Small, up front, no mistake, be clear, is a mistaken identity."). The investigative records are replete with rumor, innuendo, and hearsay statements implicating numerous parties, including the brother of Commonwealth witness Lawrence Tucker, who committed suicide a few months after Ms. Smith was killed, *see, e.g.,* N.T., May 16, 1996, at 313; N.T., July 26, 2004, at 31; an individual named Kevin McClatchey, who was later shot and killed by Appellant's codefendant, James Frye, *see* N.T., May 16, 1996, at 494; N.T., May 17, 1996, at 735; and another individual named Mitch Trivitt, who allegedly confessed to the killing of Cheryl Smith, *see* N.T., July 26, 2004, at 154. The investigation persisted for more than a decade before sufficient information was obtained to support arrests. The only actual eyewitness to the crimes to provide testimony, Tucker, had been charged by the Commonwealth as a participant, and the prosecutor conceded Tucker also lied to police. *See id.* at 1427 (reflecting the prosecutor's statement that: "Mr. Tucker is not anyone's favorite person, but the Commonwealth takes the people who are witnesses to crimes as they get them. Pleas bargains are

1. Some of the witnesses had gone so far as to fabricate diversionary tales implicating others in the killing. *See, e.g.,* N.T., May 16, 1996, at 293, 325–26 (testimony of Mary Trish Knight); *id.* at 359, 380 (testimony of Michelle Starling).

a part of life[;] ... [i]t's ability, in argument, that it makes people lie to get a deal [sic]."). There was no physical evidence connecting Appellant to the killing.

Against this backdrop, the PCRA court found several instances of deficient stewardship on the part of Appellant's trial counsel and a reasonable probability of a different verdict had constitutionally adequate representation been provided, or, in other words, a probability sufficient to undermine confidence in the verdict. *See generally Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Although the PCRA judge was not the trial judge, significantly, the court highlighted similar findings in parallel post-conviction proceedings initiated by Appellant's co-defendant, James Frey, which were adjudicated by the trial judge. Notably, this Court continues to recognize the PCRA and trial courts' superior point of vantage and to accord deference to supported factual determinations. *See Commonwealth v. Sattazahn,* 597 Pa. 648, 677 & n. 10, 952 A.2d 640, 657 & n. 10 (2008) (citing *Commonwealth v. Gorby,* 589 Pa. 364, 395, 909 A.2d 775, 794 (2006) (Cappy, J., concurring)).

In my view, recognition of the above background is necessary to a balanced and directed prejudice assessment. I also believe there is fuller, essential context relative to the individual claims accepted by the PCRA court.

With regard to Issue I(A) (ineffectiveness for failure to interview and produce Darick Sofi and Robert Elzey), the majority reasons that, even accepting Tucker's statement as a confession and assuming full impeachment of his testimony, the verdict could not have been different. *See* Majority Opinion, at 443, 980 A.2d at 560. In support of its conclusion, the majority recounts that, on direct appeal, this Court concluded in its sufficiency review that Small's "numerous statements admitting to the killing and forensic evidence" also supported the verdict. *See id.* at 443, 980 A.2d at 560. The majority reasons, in any event, the Commonwealth's theory was never that Appellant acted alone; thus, the jurors' disbelief of Tucker would not have undermined the Common-

wealth's theory of the case. *See id.* Further, the majority observes that Tucker's credibility "had been assaulted to the nth degree already." *Id.*[2]

I differ substantially with the majority's assessment. As reflected above, there were substantial reasons to question the credibility of all of the Commonwealth's fact witnesses, who, as reported to the jurors by the district attorney, had all lied to police and withheld their relied-upon testimony for up to a decade. The majority's recounting of this Court's sufficiency review on direct appeal is not persuasive, as sufficiency review is very different a review of the prejudicial impact of particular items of evidence. The majority's vague reference to "forensic evidence" also provides little support, since the only forensic evidence identified in the trial record is the testimony that the cause of death was head trauma and the manner of death was a homicide. Notably, such evidence does not serve as direct evidence of Appellant's involvement. *Cf. Commonwealth v. Gibson,* 597 Pa. 402, 444, 951 A.2d 1110, 1135 (2008) ("[T]he issue at trial was not the physical location of the victim's wounds, but rather who fired the shots in the first instance, a question that the referenced [forensic] report cannot answer.").

Appellant's trial counsel and the trial judge believed Elzey and Sofi to be important witnesses. *See, e.g.,* N.T., July 21, 2004, at 98; *Commonwealth v. Frey,* No. 2819 CA 1995, *slip op.* at 27 (C.P. York May 16, 2001) ("Because Tucker's testimony was so crucial to the Commonwealth case against the Petitioner, the testimony which would have been presented by Sofi and Elzey to impeach Tucker would have been very helpful to Petitioner's case."). The district attorney also viewed them as significant, as demonstrated by his highlighting of Sofi's and Elzey's absence as witnesses to the Common-

2. The majority adds some commentary critical of second-guessing strategy after a trial is over. *See* Majority Opinion, at 442–43, 980 A.2d at 559–60. The commentary seems somewhat inapt to the present circumstances, since no reasonable strategy was offered for failing to call Sofi and Elzey; indeed, trial counsel testified it was their intent to present these witnesses but they failed to do so. *See* N.T., July 21, 2004, at 92, 95, 98, 100–01. Moreover, the majority's holding is not predicated upon a reasonable strategy inquiry; rather, the disposition

wealth's advantage at trial. *See* N.T., May 23, 1996, at 1429 ("Did we hear from Elzey? Did we hear from Sofi? Of course not."). Furthermore, trial counsel offered no strategic reason for failing to make timely and reasonable efforts to secure the witnesses' appearance at trial. *See, e.g.,* N.T., July 22, 2004, at 368.

The majority's assertion that Tucker was cross-examined to the "nth degree" can be regarded only as hyperbole, since Appellant's trial counsel conceded traditional lines of cross-examination were omitted without strategic justification. *See, e.g.,* N.T., July 22, 2004, at 372. Additionally, in arguments to the jury, the district attorney ably bolstered Tucker's testimony with "truth verifiers" gleaned from the other evidence. *See, e.g.,* N.T., May 23, 1996, at 1445. This powerful strategy, however, might have been seriously undermined with credited evidence that Tucker himself perpetrated, or at least participated in, the killing.

The majority is correct in its reasoning that a conclusion by jurors that Tucker participated in the killing would not have excluded the possibility of Appellant's own involvement. It is difficult to disagree with the trial judge's assessment, however, that such a finding would have seriously undermined Tucker's important testimony concerning the circumstances of the killing.[3] In this regard, it may have yielded a reasonable doubt on the part of jurors concerning, at a minimum, the degree of Appellant's participation in the actual killing, and thus, potentially made the difference between a verdict of first-and second-degree murder. Therefore, I believe the trial judge's finding of prejudice in the *Frey* post-conviction proceedings, as well as that of the PCRA court in Appellant's post-conviction case, has facial appeal.

Nevertheless, there is also a fuller context to be considered regarding Elzey's and Sofi's statements themselves. In this regard, in describing the PCRA court's role in post-conviction matters, this Court has emphasized the importance of reasoned assessments of credibility and developed reasoning.

rests solely on a prejudice assessment. *See* Majority Opinion, at 443, 980 A.2d at 560.

**3.** In this testimony, Tucker obviously shifted direct responsibility for the killing to Appellant and Frey. *See, e.g.,* N.T., May 17, 1996, at 647.

*See, e.g., Commonwealth v. Williams*, 557 Pa. 207, 233, 732 A.2d 1167, 1181 (1999) (directing a post-conviction court to "render its own, independent findings of fact and conclusions of law concerning [witness] credibility and the impact, if any, upon the truth-determining process which can be discerned from such testimony."); *Commonwealth v. Basemore*, 560 Pa. 258, 293–94, 744 A.2d 717, 737–38 (2000) (highlighting the importance of credibility findings on the part of a PCRA court). What is striking, to me, from a review of the PCRA court's opinion (and the trial court's opinion in *Frey*) is the absence of any express evaluation of credibility on the part of Elzey and Sofi. While ordinarily the Court should defer to the fact-finder in terms of credibility matters, where, as here, it does not appear that any probing evaluation was made, less deference is due. Moreover, this Court has clarified that the appellate review of ineffectiveness matters is ultimately *de novo*. *See Commonwealth v. Rios*, 591 Pa. 583, 618, 920 A.2d 790, 810 (2007).

There are multiple circumstances strongly suggesting untrustworthiness on the parts of Elzey and Sofi. First, their various statements are internally and externally inconsistent. For example, Elzey gave a tape-recorded statement in May 1995 containing significant detail. This included assertions that Lawrence Tucker repeatedly bragged that he and his brother had killed a girl, and that his brother committed suicide soon thereafter due to his feelings of guilt. *See* N.T., July 28, 2004, Exhibit D–3, at 2–3, 12. When he testified at Frey's post-conviction hearing, however, Elzey omitted this significant sequence of events in its entirety. *See* N.T., October 10, 2000 (Frey), at 11 ("All I know is that [Tucker] said that he wasn't selling any drugs, because the police were questioning him [about a homicide].").[4] In Sofi's tape-record-

---

4. Elzey did testify to a later statement by Tucker (after the time of his tape-recorded statement) in which Tucker accused him of "snitching" and indicated, "We'll let bygones be bygones, because I got off from it anyway, and the other guys got shafted." N.T., October 20, 2000 (Frey), at 15. The *Frey* PCRA court, however, determined that the latter statement was not relevant, presumably because it was not information available at the time of Appellant's trial, and struck it from the record. *See id.*

ed statement and his testimony at the Frey post-conviction hearing, he indicated the conversation encompassing Lawrence Tucker's admission occurred somewhere between York and Hanover, *see id.* at 21; N.T., July 28, 2004, Exhibit D–2, at 4, but Elzey told police and testified it took place in the Littlestown area, *see* N.T., July 28, 2004, Exhibit D–3, at 6; N.T., Frey at 13.[5] Moreover, the remote location of the Cheryl Smith killing near the Maryland border is also far outside any direct route between York, Hanover, and/or Littlestown. Sofi testified at Appellant's post-conviction hearing that the conversation took place while riding "back home" from drinking, *see* N.T., July 26, 2004, at 14, but he had indicated in his tape-recorded statements that it occurred while the group was traveling toward a bar in Hanover. *See* N.T., July 28, 2004, at Exhibit D–2, at 4. Sofi indicated in his tape-recorded statement that he could not remember whether Tucker said the trio was near the location of the killing when he made his incriminating remark, *see id.* at 5 ("But I can't remember if he said here, or if he just was stating that, I iced this chick."), but at the Frey and Small post-conviction hearings Sofi said Tucker indicated that the trio was near the location of the killing. *See* N.T., July 26, 2004, at 14 ("[Tucker] said this is where I iced this chick."); N.T., October 10, 2000 (Frey), at 21 (same). Additionally, at the time of his tape-recorded statement Elzey was incarcerated, and he unabashedly sought to negotiate his release from prison. *See* D–3, at 18 ("I don't have a problem with testifying but I would want to be out of the prison environment before I would agree to do that[.]"). Sofi's criminal history at the time of his taped interview is unknown, but he was in a drug and alcohol rehabilitation center at the time of his testimony in the Frey post-conviction matter, *see* N.T., October 10, 2000, at 20, and was a state prisoner at the time of his post-conviction testimony in the present case. *See* N.T., July 26, 2004, at 20.

Although, again, I believe matters of credibility are best left to the post-conviction courts, recent decisions of this Court suggest that the appellate courts may resolve those matters in

5. Littlestown is not between York and Hanover, but rather, is well beyond such route.

cases where the lack of credibility seems facially apparent. *See, e.g., Gibson,* 597 Pa. at 450 n. 20, 951 A.2d at 1139 n. 20 (explaining that "a majority of the Court has sanctioned the dismissal of claims which might involve credibility in light of implausibility and based on conclusions drawn from the existing record." (citing *Commonwealth v. Carson,* 590 Pa. 501, 556–57, 913 A.2d 220, 251–52 (2006), and *Commonwealth v. Bryant,* 579 Pa. 119, 154–57, 855 A.2d 726, 748 (2004))). Thus, although one approach would be to remand to the PCRA court to conduct an express credibility assessment in light of the above discrepancies,[6] I am satisfied that, under prevailing law, the substantial inconsistencies in Elzey's and Sofi's statements, coupled with other credibility impairments including their motivations, would have substantially diminished any potential impact of their testimony at Appellant's trial. For these reasons, I ultimately concur in the majority's finding of a lack of sufficient prejudice.

My approach to various other of Appellant's claims is also distinct from that of the majority. On the issue of marital privilege (Issue I(B)), while I support the majority's analysis solely in light of the testimony of Appellant's admissions in the presence of Junior Carper, *see* Majority Opinion, at 446–47, 980 A.2d at 562,[7] I differ with its discrete analysis concerning the private conversation between Appellant and his wife. *See id.* at 446–47, 980 A.2d at 562. In my view, the circumstances of that conversation, viewed independently, would appear to support the PCRA court's finding of a confidential nature.[8] I

6. Such an approach would highlight the obligation of the PCRA courts to undertake a more developed assessment in the first instance. While I am very cognizant of the PCRA courts' limited resources, those courts are charged with accomplishing an essential function in capital post-conviction matters which cannot be duplicated at the appellate level. Thus, their full and appropriate review is required to assure compliance of death sentences with prevailing constitutional norms.

7. As the majority notes, the Commonwealth conceded the conversations in the presence of Charles Smith concerned a different event. *See* Majority Opinion, at 447 n.5, 980 A.2d at 562 n.5. Thus, the majority's conclusion that evidence of those conversations is cumulative of the evidence of Appellant's admission to his then-wife, *see* Majority Opinion, at 446–47, 980 A.2d at 562, is inapt.

8. In this regard, it seems to me remarks between spouses about incriminating matters made in a private setting suggest confidentiality.

find Issue II(A), involving trial counsel's alleged ineffectiveness for failing to impeach Tucker with his *crimen falsi* convictions, *see* Majority Opinion, at 451–53, 980 A.2d at 565–66, to present a closer question than the majority portrays.[9] I have previously set forth my position, connected with Issue II(L), regarding the correct application of *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657 (1998), in cases preceding the issuance of such decision. *See Commonwealth v. Williams*, 581 Pa. 57, 93 n. 4, 863 A.2d 505, 526–27 n. 4 (2004) (Saylor, J., dissenting) ("I do not believe that there is any

Indeed, this Court had previously applied a presumption of confidentiality to private marital communications, consistent with the approach of a number of other jurisdictions. *See Commonwealth v. Hancharik*, 534 Pa. 435, 442, 633 A.2d 1074, 1078 (1993) ("Communications between husbands and wives are presumed to be confidential, and the party opposing application of the rule disqualifying such testimony bears the burden of overcoming this presumption."); *accord* 3 WHARTON'S CRIMINAL EVIDENCE § 11:44 (15th ed. 2008) ("A communication between a married couple is presumed to be confidential ... unless evidence exists to the contrary."). The evidence of Appellant's admission in the presence of Junior Carper, however, tends to undermine the conclusion that the information was intended to remain in confidence between Appellant and his wife.

9. In crediting this claim in Frey's post-conviction proceeding, the PCRA judge, who was the trial judge, indicated as follows:

One of the most effective ways to impeach a witness's credibility is by bringing to the jury's attention that witness's inability to testify truthfully, by questioning the witness about his prior convictions. Trial counsel did try to impeach Tucker by implying that he had a self-serving motive for testifying and by showing that Tucker had a decreased ability to remember because of his use of alcohol and drugs on the night of the crime. However, because of Tucker's pivotal role in this case as the only witness who placed [codefendant Frey] at the scene of the crime and because the only evidence that the Commonwealth had in this case was circumstantial evidence offered through the testimony of witnesses, trial counsel's failure to properly impeach Tucker without a reasonable basis for this omission prejudiced [Frey's] case and constituted ineffective assistance of counsel. *Frey*, No. 2819 CA 1995, *slip op.* at 17–18. Again, I would acknowledge the facial appeal of this reasoning, albeit I ultimately agree with the majority that the record evidence of Tucker's admitted dishonesty, as well as his disclosed motivation to secure favorable treatment relative to the Cheryl Smith murder, served similar purposes at trial. I also agree the Commonwealth's case against Appellant was stronger than the prosecution against Frey, given the more consistent testimony of fact witnesses concerning Appellant's presence at the scene of the killing.

retroactivity concern regarding *Lassiter*, since it merely represents a plain-text reading of a substantive provision of statutory law that was in place at the time of [the a]ppellant's trial."). I am aligned with the majority's discussion concerning Appellant's waiver of mitigation (Issue II(I)) based upon the United States Supreme Court's decision in *Schriro v. Landrigan*, 550 U.S. 465, 477, 127 S.Ct. 1933, 1942, 167 L.Ed.2d 836 (2007), and the majority decisions of this Court in *Commonwealth v. Michael*, 562 Pa. 356, 367–68, 755 A.2d 1274, 1280 (2000), and *Commonwealth v. Marinelli*, 570 Pa. 622, 654–56, 810 A.2d 1257, 1275–76 (2002). On this point, I note only that I previously held a different view as reflected in my responsive opinions in *Michael* and *Marinelli*.

Justice TODD, Dissenting.

I respectfully dissent. On collateral review, the PCRA court, after conducting a hearing, awarded Appellee John Amos Small a new trial based, *inter alia,* upon its conclusion that counsel's stewardship was constitutionally deficient for failing to interview and produce two witnesses who would have testified regarding an admission to the murder by an individual other than Small. In doing so, however, the court did not make any express evaluation of these witnesses' credibility. In light of our proper role as an appellate court of limited review, our recent case law emphasizing that PCRA court credibility findings are essential to fulfilling this role, and the unique circumstances surrounding this prosecution, I believe that a remand is required for the PCRA court to make specific credibility findings regarding the testimony of these witnesses.

Our role under the PCRA is one of limited appellate review. *Commonwealth v. Johnson*, 600 Pa. 329, 345, 966 A.2d 523, 532 (2009) ("Our standard of review in PCRA appeals is limited to determining whether the findings of the PCRA court are supported by the record and free from legal error"). In fulfilling this role, Chief Justice Castille, writing for a unanimous Court, recently emphasized the import of a PCRA court's express credibility determinations in evaluating the prejudice prong of the *Strickland/Pierce* test.[1] "A PCRA

1. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987) (adopting United States Supreme Court holding in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

court passes on witness credibility at PCRA hearings, and its credibility determinations should be provided great deference by reviewing courts." *Johnson,* 600 Pa. at 356, 966 A.2d at 539. As we indicated in *Johnson,* when a PCRA hearing is held, "we expect the PCRA court to make necessary credibility determinations." *Id.* at 358, 966 A.2d at 540; *see also Commonwealth v. Washington,* 592 Pa. 698, 717, 927 A.2d 586, 597 (2007) (opining that even with recantations that might appear dubious, the PCRA court must in the first instance assess the credibility and significance of the recantation); *Commonwealth v. Basemore,* 560 Pa. 258, 293–94, 744 A.2d 717, 737 (2000) (offering that particularized assessment of the credibility of testimony is essential to resolution of ineffectiveness claims and that such assessment "is most appropriately accomplished, in the first instance, by the finder of fact"). Indeed, when PCRA courts have failed to make necessary credibility determinations, we have not hesitated to remand for such findings. *See, e.g., Johnson,* (remanding for credibility determinations related to guilt phase claims); *Basemore,* (remanding for credibility determinations related to penalty phase claims).

In the appeal before us, our review focuses on the PCRA court's award of a new trial on the basis of trial counsel's failure to interview and produce two witnesses, Darick Sofi and Robert Elzey. These witnesses would have testified that Lawrence Tucker made the statement, "this is where I iced this chick," implicating him as the murderer of the victim, Cheryl Smith. Tucker added that he believed the police were stupid and that he would get away with it. At trial, however, Tucker implicated Small as Smith's killer. Employing our Commonwealth's three-prong *Strickland/Pierce* test, the PCRA court found that Small's ineffectiveness claim based upon counsel's failure to call Sofi and Elzey at trial had merit, that there was no reasonable trial strategy for failing to obtain this witness testimony, and that Small was prejudiced by this failure.

Justice Saylor's Concurring Opinion, as well as the Concurring Opinion of Justice Baer, persuasively explain that witness

testimony undermining Tucker's testimony was relevant and would have cast doubt upon the strongest evidence connecting Small to Smith's murder. Thus, the underlying legal issue has arguable merit. Moreover, no strategic reason for failing to call witnesses Sofi and Elzey existed, satisfying the prong requiring that counsel's actions lacked a reasonable basis. Both Justice Saylor and Justice Baer surmise, however, contrary to the PCRA court, that the failure to call Sofi and Elzey would not likely have changed the outcome of Small's trial. Thus, according to the Majority, as well as the concurring Justices, Small failed to establish the prejudice prong of his ineffectiveness claim.[2]

Yet, as Justice Saylor cogently points out in his concurring opinion, noticeably absent from the PCRA court's analysis in granting Small relief are any express credibility findings concerning witnesses Sofi and Elzey. Concurring Op. (Saylor, J.) at 482–83, 980 A.2d at 583. In my view, such credibility determinations are absolutely essential because of the circumstances surrounding this prosecution. Tucker was the Commonwealth's primary witness. Additionally, Tucker was sexually intimate with Smith, abused her, and threatened to kill her. In fact, the Commonwealth initially charged Tucker with criminal homicide. Tucker, however, testified against Small after he entered into an agreement with the Commonwealth for the reduction in charges against him. Not only would have Sofi and Elzey's testimony cast doubt upon Tucker's testimony against Small, but the prosecution highlighted the absence of their testimony to the jury to convict Small. The import of Sofi and Elzey's testimony was not inconsequential—the extent of Small's participation in the murder of Williams may have been the difference between first-degree murder and second-degree murder.

2. Similar to the concurring Justices, I am not in accord with the Majority's determination that Small's communication to his wife, "[t]hat's the girl we killed," was not confidential in nature due to the circumstances in which it was conveyed. Majority Op. at 446, 980 A.2d at 562. I do agree, however, that such marital privilege was vitiated due to Small's similar confession to at least one other individual in addition to his wife.

490

While prior decisions by this Court suggest that, in certain factual scenarios, appellate review of ineffectiveness claims may be conducted where a lack of credibility is facially apparent, *see, e.g., Commonwealth v. Gibson,* 597 Pa. 402, 450 n. 20, 951 A.2d 1110, 1139 n. 20 (2008), I believe that our recent decision in *Johnson* properly reinvigorates and makes manifest the requirement that PCRA courts make credibility determinations in the first instance. Thus, in light of our proper role as an appellate court of limited review, the superior point of view held by the PCRA court to make credibility determinations, the PCRA court's duty to set forth express credibility findings in the first instance, and, most importantly, the unique circumstances underlying this capital appeal, I believe the jurisprudentially prudent course of action is to remand the matter to the PCRA court for express credibility findings concerning witnesses Sofi and Elzy.

For these reasons, I respectfully dissent.