J-S11029-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
:            PENNSYLVANIA
:
          v.                         :
:
:
MARK ANTHONY MARTIN           :
:
           Appellant           :     No. 970 WDA 2021

Appeal from the PCRA Order Entered July 20, 2021
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0013843-2011

BEFORE: PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY OLSON, J.:           **FILED: April 28, 2023**

Appellant, Mark Anthony Martin, appeals from the July 20, 2021 order filed in the Court of Common Pleas of Allegheny County denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9545. We affirm.

We previously summarized the factual and procedural history as follows:

> [In September 2011], Sonya Smith was watching television inside the second-floor bedroom of her residence in the Penn Hills section of Allegheny County, Pennsylvania. Smith and Appellant had been involved in an intimate relationship since 2006, but became estranged in May 2011. Appellant was familiar with Smith's residence from visiting and staying there throughout their relationship. Smith locked all [] the doors to her house before retiring to her bedroom that evening. At approximately 3:45 a.m. [on September 18, 2011], Smith was awakened by voices outside of her bedroom window. Smith called the police when she heard prying noises at the kitchen window, which was directly below her bedroom. Appellant and John Sloan, who were unable to gain entry through the locked doors, broke [] a

windowpane in the kitchen door to gain entry to Smith's [residence] through that door.

Shortly thereafter, Sloan, wearing black sweatpants, a black sweatshirt, gloves, a Halloween mask, and a paintball mask, entered Smith's bedroom holding a 9mm firearm. Sloan ordered Smith to lie on her bed facedown and struck Smith in the head and arms multiple times with the firearm. Appellant, who was wearing a light-colored t-shirt, grey sweatpants, and a ski mask entered Smith's bedroom shortly after Sloan. Appellant and Sloan straddled Smith and struck her multiple times in the arms and head; Sloan with the firearm and Appellant with a heavy object, most likely a crowbar.

Following the assault, the two men fled the residence. Appellant left first, exiting through the sliding glass door in the dining room, a door that because of its "stickiness" could only be opened by someone familiar with the premises. At the same time, Penn Hills police officers arrived on scene in response to Smith's 911 call. Officer Ronald Como, with the assistance of his vehicle spotlight, observed Appellant jog across the road and away from Smith's home. Officer Como exited his vehicle to approach Appellant, who immediately encountered dogs in a neighbor's yard. Officer Como's in-vehicle camera captured Appellant's image as he ran across the road and away from Smith's home.

Officer Richard Pine approached from the opposite direction and observed Sloan exiting from the side kitchen door of Smith's residence and running towards the wooded area behind Smith's home. Sloan was able to escape the immediate area but was stopped by a Penn Hills police officer responding to the scene approximately one-half mile away. Sloan was taken to the Penn Hills police station to be identified because he had no identification with him. At the police station, Sloan explained to the police officer that he had been out jogging, "blowing off steam," after a domestic argument. He was later charged with the incident once Smith was able to be interviewed and identified him as one of the assailants.

At approximately 4:30 a.m., Jerome Landrum was awakened by Appellant knocking on his door. Landrum lived approximately one-half mile from Smith's residence.

Landrum had known Appellant for over ten years, but could not see Appellant's face when he looked outside so he called the police and gave a general description of the individual knocking on his door. Unable to gain entry to Landrum's home, Appellant went next door and knocked on the door of the home of Glenn Dillard, who was Landrum's uncle. Appellant knew and called out Dillard's name, and Dillard admitted him into his residence. Police officers responded to the area based on Landrum's call and because his description of the person at his door matched the description of Appellant provided by Officer Como. The police officers did not encounter anyone on the roadway leading to Dillard's residence at that time. Landrum entered Dillard's home and encountered Appellant, who told him that he had gotten into an altercation and needed a ride home. Appellant appeared scared and repeatedly looked out the windows of Dillard's home until police officers vacated the area. Landrum refused to provide a ride to Appellant, and after approximately fifteen minutes, Appellant left Dillard's home.

Penn Hills police officers responding to Smith's home entered Smith's residence and encountered Smith, severely injured, in her bedroom. She notified the responding police officers that she immediately recognized Appellant as the second assailant based on his build, height, weight, and distinctive smell. Smith was immediately transported to the hospital for her injuries. She sustained a total of nine broken bones in her arms, bruising on her arms and back, and a concussion. As a result of the attack, Smith spent several days in the hospital and one month in a nursing facility for rehabilitation.

On September 23, 2011, en route from the rehabilitation facility to attend a funeral, Smith returned home briefly and discovered a book-bag belonging to Appellant in the dining room near the sliding glass door that Appellant exited on the night of the incident. She also found a ski mask on a table near the book-bag. Smith contacted the police, who collected the ski mask and the book-bag which contained, among other items, a crowbar. The ski mask was submitted to the crime lab, and a DNA mixture obtained from a tape lift and a suspected saliva stain from the mask were compared to the DNA profiles of Appellant and Sloan. Appellant and Sloan could not be excluded as contributors

to the sample taken from the tape lift, and Appellant could not be excluded as a contributor to the suspected saliva stain on the ski mask. Smith viewed the video recorded by Officer Como's in-vehicle camera and identified Appellant based on his build, height, weight, and skin color. Kimberly Carson and Beatrice Berry, individuals who had lengthy relationships with Appellant, were shown a still photograph from the camera video and also identified Appellant. Dillard and Landrum were interviewed at a later date and identified Appellant as the individual who entered Dillard's residence in the early morning hours on September 18, 2011.

Trial Court Opinion, 1/5/15, at 6-10 (citations and footnote omitted).

Appellant was charged with robbery - inflicts serious bodily injury, burglary, aggravated assault - serious bodily injury, and criminal conspiracy.[FN1] Appellant's first jury trial resulted in a mistrial when the jury was unable to reach a verdict. The second jury trial resulted in the jury convicting Appellant of all charges, with the exception of robbery. The trial court sentenced Appellant to an aggregate term of 17 to 34 years in prison. The trial court denied Appellant's post-sentence motions.

[Footnote 1] 18 Pa.C.S.A. §§ 3701(a)(1)(i), 3502(c)(1), 2702(a)(1), and 903(c), respectively.

[] This Court affirmed Appellant's judgment of sentence on October 26, 2015. [*Commonwealth v. Martin*, 2015 WL 6471183, at \*4 (Pa. Super. Oct. 26, 2015) (unpublished memorandum).] On April 5, 2016, our Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Martin*, 136 A.3d 980 (Pa. 2016). Appellant did not seek discretionary review with the Supreme Court of the United States. Therefore, Appellant's judgment of sentence became final on July 5, 2016.[FN2] *See* 42 Pa.C.S.A. § 9545(b)(3) (stating, "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of the time for seeking a review"); *see also* U.S. Sup. Ct. R. 13(1) (stating, "a petition for a *writ* of *certiorari* seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review")[.]

[Footnote 2] We observe that the 90th day upon which to file a petition for *writ* of *certiorari* in the case *sub judice* fell on Monday, July 4, 2016, a federal holiday. Therefore, Appellant's judgment of sentence became final on Tuesday, July 5, 2016. *See* 1 Pa.C.S.A. § 1908 (stating that, whenever the last day of any period of time referred to in a statute "shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation"); *see also* 5 U.S.C.A. § 6103(a) (listing Independence Day, July 4, as a federal holiday).

According to the PCRA court docket, Appellant filed *pro se* the instant PCRA petition on July 10, 2017. The PCRA court subsequently appointed Thomas N. Farrell, Esquire ("Attorney Farrell") to represent Appellant. Thereafter, Attorney Farrell filed a series of motions for extensions of time to file an amended PCRA petition, which the PCRA court subsequently granted. On June 3, 2020, Attorney Farrell filed a motion to withdraw, as well as a *Turner/Finley* "no merit" letter.[FN3] Motion to Withdraw, 6/3/20, at Exhibit 1. Attached as an exhibit to Attorney Farrell's motion to withdraw was a letter directed to Appellant stating that, upon review of the record, Attorney Farrell determined that there were no meritorious issues. *Id.* at Exhibit 2. The letter directed to Appellant stated that copies of the motion to withdraw and the *Turner/Finley* "no-merit" letter were enclosed. *Id.* Attorney Farrell also advised Appellant that he could, *inter alia*, proceed *pro se* with his PCRA petition or retain private counsel. *Id.*

[Footnote 3] *See Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988); *see also Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1998).

On June 16, 2021, the PCRA court notified Appellant of its intent to dismiss Appellant's PCRA petition pursuant to Pa.R.Crim.P. 907. In that notice, the PCRA court also granted Attorney Farrell's motion to withdraw. The PCRA court advised Appellant, *inter alia*, that he may respond to the PCRA court's notice of intent to dismiss within 20 days. Appellant did not file a response. On July 20, 2021, the PCRA court denied Appellant's PCRA petition.

On July 28, 2021, Lonny Fish, Esquire ("Attorney Fish") entered his appearance as counsel for Appellant and subsequently filed a motion to reconsider the order denying Appellant's PCRA petition.

On August 3, 2021, the PCRA court denied Appellant's motion for reconsideration. This appeal followed.[FN4]

> [Footnote 4] The PCRA court did not order Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The PCRA court filed its Rule 1925(a) opinion on September 14, 2021, stating that it relied upon the reasons set forth in its Rule 907 notice to support its order denying Appellant's petition.

*Commonwealth v. Martin*, 279 A.3d 1277, 2022 WL 1639538, at *1-*3 (Pa. Super. May 24, 2022) (unpublished memorandum) (original brackets omitted).

In addressing the timeliness of Appellant's PCRA petition, this Court found that,

> Appellant acknowledges in his *pro se* PCRA petition that his judgment of sentence became final on July 5, 2016, and further recognized that he had one year thereafter to file a timely PCRA petition. Appellant's *Pro Se* PCRA Petition, 7/10/17, at ¶¶24, 26. Appellant asserts that he filed his PCRA petition before July 5, 2017. *Id.* at ¶26. To reiterate, the PCRA docket shows that Appellant's *pro se* PCRA petition was filed on July 10, 2017, four days after the deadline on which to file a timely PCRA petition in the case *sub judice*. The copy of the *pro se* PCRA petition that is part of the certified record does not bear a timestamp showing the date upon which it was received or recorded as filed by the PCRA court. Moreover, Appellant's petition in the certified record is unsigned and undated. *Id.* at 60. The certificate of service attached thereto is unsigned and undated and does not state the date upon which service was effectuated. *Id.* at 61-62. Finally, the verification attached to the petition is unsigned and undated.[FN10] *Id.* at 63. As such, we [were] unable to discern [from the initial certified record] whether Appellant's PCRA petition was timely filed on or before July 6, 2017.
>
> > [Footnote 10] We further note that a copy of the envelope used to submit the *pro se* PCRA petition, which would presumably bear the date upon which the submission was mailed, is not part of the certified record.

*Martin*, 279 A.3d 1277, 2022 WL 1639538, at *5. We remanded the case so the PCRA court could determine the date on which Appellant filed his *pro se* PCRA petition.

On January 25, 2023, the PCRA court filed a supplemental opinion, finding that Appellant's *pro se* PCRA petition was filed on July 3, 2017. Based upon a review of the supplemental certified record, we concur with the trial court's assessment of the date Appellant filed his *pro se* PCRA petition. At the evidentiary hearing, Appellant provided a copy of a postage order and receipt from the Pennsylvania Department of Corrections dated July 3, 2017, which showed that Appellant mailed his *pro se* PCRA petition on that date by providing the same to prison authorities. Pursuant to the well-established principle, commonly known as the "prisoner mailbox rule," a document is deemed filed on the date an inmate deposits the mailing with prison authorities or places it in the prison mailbox. *See Commonwealth v. Jones*, 700 A.2d 423, 426 (Pa. 1997). Therefore, Appellant's *pro se* PCRA petition was timely filed on July 3, 2017, and we may consider Appellant's challenges to the July 20, 2021 order denying his PCRA petition.

Appellant raises the following issues for our review:

1. Did the [PCRA] court err and abuse its discretion by not granting an evidentiary hearing or new trial based on trial counsel's failure to object to prior bad acts evidence?

2. Did the [PCRA] court err and abuse its discretion by not granting an evidentiary hearing or new trial based on trial counsel's failure to use "Kennywood civil lawsuit depositions" [to impeach] Sonya Smith?

3.  Did the [PCRA] court err and abuse its discretion by [not granting] an evidentiary hearing or new trial [based on] trial counsel's [failure] to properly cross[-]examine and impeach [] Cassandra Hicks?

4.  Did the [PCRA] court err and abuse its discretion by [not granting] an evidentiary hearing or new trial [based on] the reported after-discovered evidence, namely the affidavit of Beatrice Berry?

Appellant's Brief at 6 (extraneous capitalization omitted).

In addressing Appellant's issues, we are mindful of our well-settled standard and scope of review of an order denying a PCRA petition. Proper appellate review of a PCRA court's denial of a petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Miller*, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Commonwealth v. Lawson*, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." *Commonwealth v. Hickman*, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's legal conclusions *de novo*. *Commonwealth v. Henkel*, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014). When a PCRA court dismisses a petition without holding an evidentiary hearing, this Court examines "whether the PCRA court erred in concluding that there were no genuine issues of material fact and in denying relief without an evidentiary

- 8 -

hearing." ***Commonwealth v. Hart***, 199 A.3d 475, 481 (Pa. Super. 2018) (stating that, if there is no factual dispute, an evidentiary hearing is not required).

Appellant's first three issues collectively raise a claim of ineffective assistance of trial counsel. Appellant's Brief at 13-21. Specifically, Appellant asserts that trial counsel was ineffective for (1) failing to object to evidence of Appellant's prior bad acts; (2) failing to impeach the credibility of the victim; and (3) failing to impeach a Commonwealth witness. ***Id.***

"It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." ***Commonwealth v. Koehler***, 36 A.3d 121, 132 (Pa. 2012), *citing* ***Strickland v. Washington***, 466 U.S. 668, 687-691 (1984). To plead and prove a claim of ineffective assistance of counsel, "a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." ***Commonwealth v. Stewart***, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*), *appeal denied*, 93 A.3d 463 (Pa. 2014). "A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs." ***Commonwealth v. Martin***, 5 A.3d 177, 183 (Pa. 2010).

In his first issue, Appellant contends trial counsel was ineffective for failing to object to testimony regarding Appellant's alleged involvement in the vandalism of Smith's vehicle and house, which occurred several months prior

to the incident that led to Appellant's aforementioned convictions. Appellant's Brief at 14-15. Appellant contends the Commonwealth "elicited testimony [from Smith] which allowed the jury to infer that [Appellant] committed this prior uncharged crime" of vandalism. *Id.* Appellant asserts that the trial court, at the start of the trial, ruled that Smith was not permitted to testify "that [Appellant] vandalized her property sometime after their break-up." *Id.* at 14. Appellant argues that, when Smith began to testify about vandalism to her vehicle and house, trial counsel failed to immediately object to Smith's testimony, to move for a mistrial, or to request a curative instruction. *Id.* at 15.

"While evidence of prior bad acts is inadmissible to prove the character of a person in order to show conduct in conformity therewith, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." *Commonwealth v. Busanet*, 54 A.3d 35, 43 (Pa. 2012). "Although evidence of prior bad acts may be relevant and admissible, due to the potential for misunderstanding, [a] defendant is entitled to a jury instruction cautioning that the evidence is admissible only for a limited purpose." *Commonwealth v. Housman*, 226 A.3d 1249, 1261 (Pa. 2020). It is well-settled that a jury is presumed to follow the trial court's instructions. *Commonwealth v. Jones*, 668 A.2d 491, 504 (Pa. 1995).

In addressing Appellant's ineffectiveness claim, the PCRA court stated,

> As soon as [Smith] began to testify regarding spray paint damage [to her house] on direct examination, trial counsel objected and was granted a sidebar. While [trial] counsel did not move for a mistrial, counsel did object before [Smith] specifically stated that [Appellant] was the one who spray painted her house. Further, trial counsel requested that the trial court issue an immediate jury instruction to strike the answer, and the trial court did so.

PCRA Court Rule 907 Notice, 6/16/21, at 7 (record citations, footnote, and extraneous capitalization omitted).

A review of the record demonstrates that, as a pre-trial matter, the trial court denied the Commonwealth's request to present evidence of prior bad acts allegedly attributed to Appellant, including evidence of vandalism to Smith's residence and vehicle, and the fire-bombing of Smith's neighbor's house. N.T., 10/16/13, at 40. During the direct examination of Smith by the Commonwealth, however, the following dialogue occurred:

| [Commonwealth:] | Tell this jury how [Appellant] reacted when you terminated the relationship? |
|---|---|
| [Smith:] | Extremely violent. |
| [Commonwealth"] | Describe the term "extremely violent". |
| [Smith:] | It started in weeks. The first week my car broke down. I didn't know why it broke down. I just paid it off. It only had 35,000 miles on the car. I took the car to the dealership. They wanted $900[.00] for the car. |
| | The next day, my house was spray painted red, every window, every wall. Every concrete block was spray painted red. That following Friday - |

N.T., 10/17/13, at 185. Thereafter, Appellant's trial counsel objected. *Id.* at 185-186 (stating, "the objection is based on the anticipation of certain testimonial evidence that has previously been excluded by" the trial court). The trial court, upon concluding a sidebar discussion with trial counsel and the Commonwealth, struck Smith's statements regarding alleged vandalism and issued the following curative instruction, "As to that last series of questions and answers in regard to what happened to [Smith's] house, *et cetera*, you are to disregard the answers and strike them from your consideration." *Id.* at 186-187.

Upon review, we concur with the trial court that the underlying claim that forms the basis of Appellant's ineffectiveness claim is without arguable merit. Immediately after Smith mentioned the vandalism to her vehicle and residence, trial counsel objected, and the trial court struck the testimony and provided a curative instruction to the jury. Furthermore, Appellant failed to demonstrate how this statement prejudiced him given the curative instruction. Therefore, Appellant's challenge to the trial court's denial of his petition on this ground is without merit.

Appellant further asserts that trial counsel was ineffective for failing to object to the Commonwealth's questioning of Beatrice Berry, a witness for the Commonwealth, regarding a letter Appellant wrote to Berry "allegedly asking her to fabricate her testimony." Appellant's Brief at 15.

On direct examination, the Commonwealth questioned Berry regarding a letter Appellant sent to her. N.T., 10/18/13, at 461-465. Several times,

Berry stated that she did not recall the content of the letter. *Id.* Trial counsel lodged an objection to this line of questioning and the introduction of the content of the letter *vis-à-vis* the Commonwealth's questions to its witness. *Id.* at 465-466. The Commonwealth explained that the purpose of the questioning was to undermine Appellant's anticipated case-in-chief. Through Berry, the Commonwealth sought to place potential rebuttal evidence on the record showing that Appellant, not the Commonwealth, asked Berry to fabricate her testimony. N.T., 10/18/13, at 467. The trial court sustained the objection, and the Commonwealth tendered the witness for cross-examination. *Id.* at 468, 472. The letter was not admitted into evidence.

Upon review, Appellant's claim that trial counsel failed to lodge an objection to the Commonwealth's questioning of Berry regarding the content of the letter is belied by the record. Trial counsel, shortly after the Commonwealth began its line of questioning, objected and the trial court sustained the objection, thus ending the Commonwealth's line of questioning. Moreover, Appellant failed to demonstrate how Berry's examination regarding this letter prejudiced him. In fact, when the Commonwealth asked Berry if Appellant's statement to her in the letter – "you know I never was [Smith's] boyfriend" – was a lie, Berry responded, "I don't think it's a lie because every time they [(Appellant and Smith) were] together and after they [were] together, he would adamantly say he wasn't [Smith's] boyfriend." *Id.* at 465.

Therefore, we find Appellant's ineffectiveness claim on this ground to be without merit.

In his second issue, Appellant asserts that trial counsel was ineffective for failing to impeach Smith's credibility with her deposition in an unrelated civil lawsuit Smith filed against an amusement park. Appellant's Brief at 17-19. Appellant asserts that Smith's lawsuit "related to a neck and left shoulder injury that [Smith] suffered at [the amusement park] in 2008." *Id.* at 17. Appellant argues that the deposition testimony established that Smith had "limited mobility with her neck and head, [and] would not have been able to see someone run by her bedroom [doorway on the night of the assault], nor would she have been able to see this person in detail." *Id.* at 18. Appellant contends trial counsel should have used this deposition testimony to impeach Smith's testimony at trial. *Id.*

To reiterate, to plead and prove a claim of ineffective assistance of counsel, "a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." *Stewart*, 84 A.3d at 706. A failure to impeach a key witness "is considered ineffective in the absence of a strategic basis for not impeaching." *Commonwealth v. Small*, 980 A.2d 549, 565 (Pa. 2009).

We agree that the PCRA court correctly denied relief on this claim. The PCRA court properly noted that Appellant's counsel cross-examined Smith regarding the content of her lawsuit against the amusement park and

highlighted that she alleged in her complaint that she sustained injuries to her left shoulder, arm, and back. N.T., 10/17/13, at 245-247. Appellant's counsel, however, did not inquire whether the injuries Smith alleged she suffered at the amusement park prevented her from observing the second assailant during the incident in the case *sub judice*. **Id.** at 247-262. Nonetheless, trial counsel, through cross-examination, established that Smith did not observe the second assailant. On cross-examination, the following dialogue occurred between Appellant's trial counsel and Smith:

| | |
|---|---|
| [Trial Counsel:] | With respect to the second man, you said that [he] left first in relation to both of [the assailants], correct? |
| [Smith:] | Correct. |
| [Trial Counsel:] | But you never saw [the second man] leave the bedroom either? |
| [Smith:] | I felt him leaving the room. |
| [Trial Counsel:] | So just to clarify for the purposes of the record[,] the second individual, you never saw [him] enter [the bedroom]. You never saw [him] leave [the bedroom]. Correct? |
| [Smith:] | Correct. |
| [Trial Counsel] | In fact, with respect to this second man, you never saw his face, correct? |
| [Smith:] | That is correct. |
| [Trial Counsel:] | You never saw his arms, correct? |
| [Smith:] | That is correct. |
| [Trial Counsel:] | You never saw his hands, correct? |
| [Smith:] | That is correct. |
| [Trial Counsel:] | Never saw his legs, correct? |

| [Smith:] | Correct. |
|---|---|
| [Trial Counsel:] | And you never saw his feet, correct? |
| [Smith:] | No, I didn't see his feet. |
| [Trial Counsel:] | Likewise, you never saw the color of his skin tone as you testified to on direct? |
| [Smith:] | Well, he wasn't wearing pants - I mean shorts. He was wearing pants. |
| [Trial Counsel:] | Well, anywhere on his body? |
| [Smith:] | No, I did not see him. |

*Id.* at 259-260. As the foregoing exchange demonstrates, trial counsel established through cross-examination that Smith did not visually observe Appellant on the night of the assault, which was the ostensible purpose of using Smith's prior lawsuit to discredit her identification of Appellant as one of her attackers.

Nonetheless, Smith testified that she was able to identify the second assailant as Appellant through nonvisual means of observation. She stated that she knew Appellant to be one of her attackers because (1) his unique smell, (2) the second assailant knew how to disconnect the telephone land-line in Smith's house by going to the basement upon entering the house, and (3) the second assailant knew how to exit Smith's residence using the sliding door, which required a special nuance to open the door. *Id.* at 261, 300-301. Because Smith identified Appellant based upon criteria other than her observation of Appellant, use of the lawsuit deposition testimony pertaining to Smith's difficulty in turning her head and body would not have challenged the

- 16 -

credibility of Smith. Therefore, Appellant's ineffectiveness claim on this ground is without merit.

In his third issue, Appellant asserts that trial counsel was ineffective for failing to impeach Cassandra Hicks with *alibi* testimony she provided in Appellant's mistrial and for failing to elicit similar *alibi* testimony from Hicks in the second trial.[1] Appellant's Brief at 20-21. Appellant contends the PCRA court erred in denying his petition on this ground without an evidentiary hearing because a genuine issue of fact exists as to trial counsel's reason for failing to impeach Hicks or to elicit *alibi* testimony. ***Id.***

A review of the record demonstrates the following cross-examination of Hicks by Appellant's trial counsel regarding Hicks' identification of Appellant's voice as the voice heard in the recording of Smith's 911 call:

| [Appellant's Counsel:] | Can you tell the jury any of the words that you recognized [Appellant] to say? |
|---|---|
| [Hicks:] | He said to "shut up" and he said to "shut the F up". |
| [Appellant's Counsel:] | And did you hear him say something to [] the effect of "you should have been dead last week" or "you should have been dead"? |
| [Hicks:] | I don't remember. |

---

[1] Appellant asserts that Hicks "testified on behalf of the Commonwealth" in the current trial. Appellant's Brief at 20. This assertion is belied by the record. The record demonstrates that the witness was, in fact, called to testify on behalf of Appellant's co-defendant. N.T., 10/22/13, at 680-683.

N.T., 10/22/13, at 682. On cross-examination by the Commonwealth, Hicks admitted that she heard more than one voice in the 911 call recording. **Id.**

Contrary to Appellant's assertion, trial counsel was not ineffective for failing to impeach Hicks using her prior testimony in Appellant's mistrial, which provided Appellant with an *alibi* for the night of the incident. **See** N.T., 4/11/12, at 508-526 (stating, in sum, that Appellant was home ill on the evening of the incident, never leaving his house, and Hicks had been with him the entire time). If trial counsel used Hicks' prior *alibi* testimony to impeach Hicks in the second trial, this line of questioning would have impeached Appellant's daughter's testimony in the second trial wherein she provided an *alibi* for Appellant on the night of the incident. N.T., 10/21/13, at 598-601 (stating, in sum, that Appellant's daughter was caring for Appellant, who was ill, on the evening of the incident and Appellant never left his house); **see also id.** at 608 (stating, Hicks never provided Appellant any assistance on the evening of the incident and was not with Appellant that evening). Moreover, the cross-examination of Hicks by trial counsel indirectly challenged the credibility of Smith's testimony. During her testimony, Smith identified the co-defendant, rather than Appellant, as making statements to her during the assault, and Smith specifically stated that Appellant did not speak to her during the incident to shield his identify from her. N.T., 10/17/13, at 200 (identifying the co-defendant as the person who told Smith, "Turn over, turn over. You should have been dead last week."); **see also id.** at 261 (stating that, she never heard the "second man," who she identified as Appellant,

speak because "[h]e would have give[n] himself away if I were to hear his voice"). As such, trial counsel had a reasonable basis for not impeaching Hicks with her prior *alibi* testimony.

Additionally, the impeachment of Hicks would not have led to a different verdict. First, as discussed *supra*, the impeachment of Hicks would have impeached the testimony of Appellant's daughter, who provided an *alibi* for Appellant. Second, there was other evidence linking Appellant to the incident aside from Hicks' identification of Appellant's voice in the 911 call recording. *See* N.T., 10/17/13, at 300-301 (stating that, Smith was able to identify Appellant's presence at the assault by his smell and his knowledge of her residence); *see also id.* at 307 (stating that, a police officer identified Appellant as the person he observed on the street near Smith's residence on the evening of the incident); N.T., 10/18/13, at 408-409 (stating that, a Commonwealth witness was able to place Appellant in a house near Smith's residence shortly after the incident); *id.* at 427-428 (stating that, a Commonwealth witness placed Appellant at his house, which was near Smith's residence, shortly after the assault); *id.* at 442 (stating that, a Commonwealth witness was able to identify Appellant as the person captured in the police video camera footage recorded on the evening of the incident). Consequently, Appellant's ineffectiveness claim on this ground is without merit.

In his final issue, Appellant raises a claim of after-discovered evidence, asserting that the exculpatory proof, namely the affidavit recently provided by Berry, would justify a new trial. Appellant's Brief at 21-24. In her affidavit,

Appellant contends, Berry states that her identification of Appellant as the individual in a photograph shown to her by police was fabricated, that she felt coerced by a police detective to fabricate this identification, and that the trial court attempted, during an off-the-record, in-chambers meeting during trial, to coerce Berry to identify Appellant as the individual in the photograph. ***Id.***; ***see also*** Appellant's *Pro Se* PCRA Petition, 7/3/17, at Exhibit BB.

To obtain a new trial based on after-discovered evidence, a petitioner must satisfy a four-part test requiring

> the petitioner to demonstrate the [after-discovered] evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Commonwealth v. Small***, 189 A.3d 961, 972 (Pa. 2018), *citing* ***Commonwealth v. Pagan***, 950 A.2d 270 (Pa. 2008), *cert. denied*, 555 U.S. 1198 (2009). "The test is conjunctive; the [petitioner] must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted." ***Commonwealth v. Padillas***, 997 A.2d 356, 363 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (Pa. 2010). The "salutary goal of the after-discovered evidence rule [is] to limit continued litigation without being so rigid as to shut out [after-]discovered evidence **from a credible source** which may lead to a true and proper judgment." ***Small***, 189 A.3d at 975 (citation omitted, emphasis added).

In denying Appellant's petition on this ground, the PCRA court explained,

[Appellant] alleges that [a police detective] lied regarding [Berry] identifying [Appellant] from [a] police photo[graph,] and that the trial court took [Berry] into chambers during trial and tried to "bribe" her into identifying [Appellant] in the photograph. Both claims are meritless. First, the affidavit in question mirrors the testimony [Berry] gave at trial. As such, the affidavit fails to qualify as [after-]discovered evidence. Further, the evidence fails to establish that[,] at any time during trial[,] a recess was taken where the trial court then escorted [Berry] into chambers for any type of discussion.

PCRA Court's Rule 907 Notice, 6/16/21, at 8-9 (extraneous capitalization omitted). In other words, the PCRA court found that the after-discovered evidence, namely the affidavit, would not result in a different outcome if a new trial were granted because the assertions contained in the affidavit mirrored the testimony provided by Berry at trial, and the information contained in the affidavit was not credible.

In the affidavit, Berry stated, in pertinent part, that

When I was interviewed by [the police detective] and [counsel for the Commonwealth] about the photo[graph] from a police camera[,] I was asked [whether] I recognize[d] the person in the photo[graph]. I told them both that no I didn't. [The police detective] then asked was I sure and I said yes I was sure. He then pulled the photo[graph] back and asked how I was doing[ and] asked about my criminal history and any pending charges[. I]t was clear he already knew my history. He then asked was I still clean, he asked about my family[,] and then asked was everything going well. I told him yes[. H]e smiled, leaned back and looked at me[,] and said[,] with all that being said, [as] he slid the photo[graph] back across the table[,] you still don't know who that is? I said no and then asked to be excused. He then said by all means, I'm sure with your track record and the path you are choosing we will meet again. I said what are you saying? He looked at me for a moment then back to the photo[graph] then back at me and said I'll be in touch. I then left. I had several conversations with [the police detective] after that and they were all awkward with him trying to get me to say the photo[graph

- 21 -

depicted Appellant] and to get me to testify against [Appellant]. Eventually I stopped taking his calls.

[At Appellant's trial,] I was in the process of being questioned by [the Commonwealth when] I let the [trial] court know that I felt threatened and fearful of [the police detective] because of what was called cooperating when I was interviewed by [the police detective] regarding a police cam[era] photo[graph] I did not recognize. While still on the stand, [the] court proceeding[] was stopped by [the trial judge]. I was then escorted into the [j]udge['] chambers alone. Once inside, [the trial judge] asked me to have a seat. He asked me would I like a snack and pulled open a drawer full of snacks. I said no thank you. He then asked would I like a glass of water or [soda]. I declined. He asked me if I was okay and I said yes. He then produced a photo[graph.] I noted it was the same picture that [the police detective] showed me on a previous date. [The trial judge] then asked me did I tell [the police detective and counsel for the Commonwealth] that the person in the photo[graph] was [Appellant]. I told him no. Then he asked do you know who that is in the photo[graph]. I said no. He said are you sure, I said yes I'm sure. He then [said] all you have to do is tell the truth[,] it will be okay. I said I am telling the truth. I said look at the photo[graph], it's too blurry to identify anything except that the person is wearing white shoes. He then told me thank you and asked was I ready to go back in the courtroom. I said yes and we went back in[to the courtroom and the court proceedings] resumed. I never talked to [Appellant's] lawyer about the case.

Appellant's *Pro Se* PCRA Petition, 7/3/17, at Exhibit BB (paragraph sequence modified).

At trial, the Commonwealth cross-examined Berry, in pertinent part, as follows:

| [Commonwealth:] | You identified somebody in that photograph, right? |
|---|---|
| [Berry:] | You all asked me do I know who that is in that picture. |
| [Commonwealth:] | What did you say? |

| | |
|---|---|
| [Berry:] | I told you I don't know who that person was in that picture. |
| [Commonwealth:] | Do you remember telling [a police detective] anything else about the photograph? |
| [Berry:] | No. |
| [Commonwealth:] | Is it your testimony that - what is your testimony?  What did you tell [the police detective] about the image in that photograph? |
| [Berry:] | I told you that picture is blurry, and I don't know who is in that picture.  You all went on to tell about all of this stuff that was being [talked] about in the interviews that you all been taping to [Appellant] what I'm saying, that he called, that I was supposed to be having sex with him, and he's talking about, bad about me and [Hicks], about how we were supposed to be - he had got way outta control, talking about me, all of that stuff there - |
| | [Berry:]  And can I say this, too, Your Honor? |
| [Berry:] | And know that I am - right now, I'm scared to be in this, up in this stand.  I'm still telling the truth.   [The police detective] came - I got a letter in the mail, and they came to the program I was in, and I was doing very well, and right now, they came to my program, and they gave me a warrant, a [s]earch [w]arrant to take the letter from [Appellant] in the program, and [the police detective] was telling me how I was being talked about really bad by [Appellant] and stuff, and [the police detective] showed me the picture of [Appellant].  If you look at that picture, it's a blurred shot.  It really is. You can't even tell who is in the picture, and I'm saying now my testimony is that |

I don't know who that is in the picture, but at the time, I was very afraid, and I'm afraid now. I'm shaking like a leaf.

I'm in a certain system right now, and I want it to be known that I'm in the system, and I'm still telling the truth, I'm going to tell the truth, but I should feel that my testimony is being told the truth, and I hope this does not [affect] my case in any kind of way.

I do not know who that is in that picture. You can't even tell, and I know [Appellant] very well, very well, and I cannot tell if that's him or not in that picture.

[Commonwealth:]    Do you recall talking to [another police detective]?

[Berry:]    Yes, I told him then I don't know who it is in the picture, and [the other police detective] kept telling me stuff about [Appellant] trying to make me angry, and I was getting angry, and I said I don't know who that is in the picture, and [the police detective] even came to my program to come get that picture with [the program counselor], and I told them I don't know who that is in the picture, and [the program counselor] kept even advising me if I know, to say it. If I know it, to say it. If I know who did this heinous crime, to say it, and I said I don't know who it is in the picture, and [the police detective] told me to give it some thought.

And I even made several calls to him on his phone. I left messages about how upset I was about whether I even wanted to testify. But I don't know who that is in that picture.

. . .

| | |
|---|---|
| [Commonwealth:] | Was there anything in that [photograph] regarding the clothing that [the person] was wearing that meant anything to you that you related to [the police detective]? |
| [Berry:] | The only thing I said that I said about that picture that day is it is very blurry. |
| | The only thing you can tell in the [photograph] is the person [is] wearing [] white tennis shoes. That's all I said. That's the only thing you can tell. They got on white tennis shoes. |

N.T., 10/18/13, 456-458, 460. At no point during Berry's testimony did the trial court recess. *Id.* at 446-473. Prior to the conclusion of Berry's testimony, the trial court removed the jury from the court room to conduct an in-court discussion with counsel regarding some evidentiary issues. *Id.* at 466-473. At the conclusion of the in-court discussion, Berry was excused. *Id.* at 473.

Upon review, we concur with the trial court that the affidavit does not constitute after-discovered evidence justifying a new trial. The information contained in the affidavit mirrors Berry's testimony at trial where she maintained that, due to the blurry condition of the images depicted in the photograph, she was unable to identify the person other than to say the person was wearing white shoes. Therefore, the information in the affidavit is cumulative of the testimony presented at trial. Moreover, the trial court's conclusion that the affidavit is not credible is supported by the record. There is no indication in the record that a court recess was taken, and it is unimaginable the level of collusion that would be required, *i.e.*, tipstaff, court

reporter, attorneys, jury, trial judge, to "cover-up" the type of coercive action as alleged in the affidavit. Consequently, Appellant's claim that the affidavit constitutes after-discovered evidence justifying a new trial is without merit.

For the reasons stated herein, we find no abuse of discretion or error of law in the PCRA court's order denying Appellant's petition without an evidentiary hearing.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  April 28, 2023